COURT OF APPEALS. Albany, March, 1856. *Denio, A. S. Johnson, Comstock, Selden, Mitchell, Wright, Hubbard* and *T. A. Johnson,* Judges.

## THE PEOPLE *vs.* THOMAS TOYNBEE. (*a*)

The act of April 9, 1855, entitled " an act for the prevention of intemperance, pauperism and crime," in its operation upon property in intoxicating liquors existing in the hands of any inhabitant of this state when the act took effect, is a violation of that provision in the constitution of this state, which declares that no person " shall be deprived of life, liberty or property without due process of law," for the reason that by the provisions, prohi bitions and penalties contained in the act, it substantially destroys the prc. perty in such liquors.

Inasmuch as the prohibitory act does not discriminate between liquors exist, ing when it took effect as a law, and such as might thereafter be acquired by importation or manufacture, and does not countenance or warrant any defence based on such distinction, it can not be sustained in respect to any such liquor, whether existing at the time the act took effect or acquired subsequently.

It would be competent for the legislature to pass such an act as the prohibitory act (except as to some of the forms of proceeding to enforce it) provided such act should be plainly and distinctly prospective, as to the property on which it should operate.

The proceeding in a court of Special Sessions authorized by the said act is unconstitutional and void, on the ground that the party accused is thereby deprived of the right of trial by jury guarantied by the constitution.

The expression in the constitution " due process of law " was intended to secure to every citizen, at least in criminal cases, the benefit of those rules of the common law, by which judicial trials are regulated, and to place them beyond the reach of legislative subversion. By SELDEN, J.

The first branch of the seventeenth section of the prohibitory act which provides that " upon the trial of any complaint commenced under any provisions of this act, proof of the sale of liquor shall be sufficient to sustain an averment of an unlawful sale, and proof of delivery shall be *prima facie* evidence of sale," is in violation of the constitutional provision which

(*a*) The reporter has thought it would be convenient for the profession in this state and elsewhere, to have, brought together, all the decisions made by the higher courts of this state, on the various provisions of the " prohibitory liquor act." He has therefore published in this volume, in addition to the decisions in the Supreme Court, the recent and final decisions of the Court of Appeals, by which the act was declared unconstitutional and void.

The People v. Toynbee.

secures to every person a trial by due process of law, inasmuch as it authorizes a presumption of guilt, when the common law would presume innocence. Per Selden, J.

The legislature has no power to subvert that fundamental rule of justice, which holds that every man shall be presumed innocent until he is proved guilty. Per Selden, J.

The second branch of the seventeenth section of the act, which provides, that upon the trial of a complaint for an unlawful sale of liquor, the defendant shall not be permitted to justify under the second section, unless he shall admit the sale, swear that, at the time he sold the liquor, he believed it was not intended to be used ·in a mode forbidden by the act, and set forth the reasons on which his belief was founded, is a violation of that provision of the constitution of this state which secures to the party accused the right " to appear and defend," and of that which declares that no person " shall be compelled to be a witness against himself," and is therefore void. Per Selden, J.

The last clause of the first section of the prohibitory act does not except imported liquors from the operation of the act, after they have left the hands of the importer. Per Hubbard and T. A. Johnson, JJ.

The prohibitory act, in prohibiting the sale of imported liquors, by retail, within the interior of the state, after they have left the hands of the importer, is not legally objectionable, as being in conflict with the revenue laws of the United States. Per Hubbard, J.

That portion of the prohibitory act which authorizes the seizure and destruction of liquor where the prosecution or conviction of the owner is not contemplated, is unconstitutional and void, inasmuch as it deprives the citizen of his property, without " due process of law." Per Hubbard, J.

The " legislative power " conferred by the constitution on the legislature is not subject to any judicial control beyond the restrictions specially declared in the constitution, if it be not so exercised as to invade the constitutional province of some other department of the government. Per Selden and A. S. Johnson, JJ.

The defendant was arrested without a warrant by John Matthews, the complainant, a police officer, under the twelfth section of the act entitled " an act for the prevention of intemperance, pauperism and crime," passed 9th April, 1855, for selling in his presence, a glass of brandy and a bottle of champagne, who seized the said liquors together with the vessels in which they were contained.

The defendant was taken before Daniel K. Smith, a police justice of that city, by the officer, and there charged by him in substance with keeping for sale and having in his possession with an intent to sell, intoxicating liquors, and with selling one

glass of brandy and one bottle of champagne, contrary to the provisions of that act.

He moved to dismiss the complaint and for his discharge, on the ground that it did not appear by the complaint that any crime or offence had been committed by him, and on the further ground that the provisions of the said act were unconstitutional and void. This motion was denied. He thereupon stated to the justice that he did not request to be tried by a court of Special Sessions, but objected to such a trial, and he offered to give bail to appear at the next court having criminal jurisdiction. The justice refused to receive such bail, and required the defendant to plead to the charge, whereupon he pleaded not guilty. It was then proved by Matthews that the defendant, Toynbee, kept a hotel in Montague Place, near Court street, in the third ward of the city of Brooklyn, on the 17th day of July last; that he on that day, in a bar room in the basement of the hotel, kept intoxicating liquors for sale, and sold and received payment for one glass of brandy and one bottle of champagne wine; that both the brandy and champagne wine were intoxicating liquors, and that the champagne wine was imported liquor.

The court thereupon found the defendant guilty of selling and having in his possession with intent to sell intoxicating liquors, as charged in the complaint, adjudged him guilty of a misdemeanor, sentenced him to pay a fine of $50 and the further sum of $5·87 for the costs and fees of the judgment, and that he stand committed until such fine and costs were paid, not exceeding fifty-six days, and further adjudged that the liquors seized by the officer and described in the complaint be forfeited, and that a warrant issue for their destruction.

The defendant appealed from that judgment to the Supreme Court, sitting in the second district, when the judgment was reversed. (See *supra,* page 329.) The people appealed from the judgment of the Supreme Court to this court.

*J. M. Van Cott* for appellants.

I. The sale of imported liquor in less quantity than the package of importation is contrary to the prohibitory act.

1. Such sale is not in terms excepted by the first section, and the twenty-second section, which defines and limits the more general expressions of the first, clearly restricts the exception to the original package.

2. The purpose which speaks through the entire language and frame of the act was to carry the prohibition up to the point where sales were permitted by federal laws and to stop at that constitutional limit. The exception should be read as if the act of congress and the effect interpreted into it by Brown v. The State of Maryland, were incorporated into it. (*See Brown* v. *Maryland,* 12 *Wheat.* 446.) This construction was adopted by the court below, and is necessary to suppress the mischief.

II. The prohibition is not total. (1.) It permits the liquor to be kept and to be used by its owner for any and every purpose. (2). It permits an unlimited sale by the owner within this state, for three months, subject to existing laws. The prohibition was prospective and within the principle of the laws abolishing slavery and of the registration acts. (*See Varick* v. *Briggs,* 6 *Paige,* 323; *S. C. in error,* 22 *Wend.* 543.) (3.) It permits the owner to export the whole of it, at all times, thus partially closing the domestic market, but leaving the foreign open. Suppose it had closed the foreign and left open the domestic market, on the principle of the laws against the export of corn and bullion. (4.) It permits the domestic sale of imported liquor in the bulk of importation. (5.) It permits the sale (under license, and the validity of a license system is not denied,) of all the liquor within the state, for mechanical, manufacturing and medicinal purposes. (6.) It prohibits sales only *sub modo* and the keeping of liquor for such unlawful sale. (7.) The purpose of the act is not to take property or destroy it. All of it might be safe to the end of time with the law in full force. It takes no property, it destroys nothing, it punishes nobody; and *it is the policy* (as it will be the desired consummation of the act) *that nothing shall be destroyed or taken, and*

*that nobody shall be hurt.*  All this is very different from the rapacious seizure and destruction charged against the act.

III.  The prohibitory act does not transcend the limits of the legislative power; and, indeed, every essential feature of the act is familiar to British and American legislation.  The court must look at the legislative point of view.  Its aim is to prevent, by punishing acts deemed demoralizing and destructive to society, i. e. to prevent intemperance, pauperism and crime. The *subject* and general *object* of the act are within the admitted scope of legislative power.  The form of the act defining the offence and prescribing the punishment, is within the common formula of legislation; and all the remedies it provides have numerous precedents in British and American statutes.  Assuming the liquor traffic to be a great evil, as the tremendous and alarming statistics embodied in the legislative inquiries and reports demonstrated it to be, the legislature deemed it proper to protect society from it by efficient laws.  That intemperance, pauperism and crime are great evils may be assumed.  That the traffic in liquor tends to increase those evils will be admitted.  That the prohibitory act is designed and will tend to prevent those evils is also conceded.  That it is competent to society to prevent such evils by laws will hardly be denied.

But the act is argued to be void for excess; it has gone a degree too far.  Surely, that question of degree is not one of judicial cognizance.  It is not raised upon the record as a question of fact, and our judicial system provides no mode for its determination by a court or jury.  The question of degree, of how much, is always relative.  Enough is what will produce the effect sought.  How much is " necessary and proper " to produce a given effect, must be solely for the legislative discretion within constitutional limits.  The degree of the law depends upon the degree of the evil, which may be ten times greater a year hence than now, and which may now be ten times greater than the court may suppose it to be.  If the evil were ten times greater, would the act be *excessive in degree?* Yet the constitution has no sliding scale.  The basis of fact

assumed by the legislature must be assumed by the court in determining whether the act is constitutional or void.

IV. The prohibition does not violate the restrictive clauses of the federal or state constitution. (1.) Private property is not taken for public use. Fines for crimes and forfeitures for violation of belligerent rights and of revenue and other laws, stand upon a fundamentally different principle. (2.) Under it, no citizen of this state is "disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." (*State Constitution, art.* 1, § 1.) This provision only requires that there shall be a valid law, authorizing the thing to be done, and a valid judgment where a judicial determination is required by such law. (a) This provision is not a limitation on the powers of the legislature to define new offences. Things not nuisances by common law may be made so by statute. And whether a thing be a nuisance or not depends upon the finding by the jury of the facts, within the statute or common law definition, and not upon the opinion of a judge, whether the thing is intrinsically noxious. So things which are nuisances at the common law may be permitted by the legislature. (18 *Barb.* 22.) The validity of the act can not depend upon the question whether the word "nuisance" is used with technical accuracy, but upon the power of the legislature to subject certain things to be treated as prescribed. (b) Nor is any act affecting the alienability of property within this constitutional restriction. It is universally true that property is alienable. Statutes and other restraints upon contracts of purchase and sale are numerous. At common law, choses in action are not assignable. Land held adversely can not be sold. Some of the accustomed restraints depend upon the capacity of the parties, some upon the form and mode of the contract, some upon the nature of the property; but none have ever been thought to conflict with the constitution. (c) It has been generally conceded by anti-prohibitionists, that if there was an apparent necessity for the law, amounting to "probable cause," it is valid. Such a test is not

sanctioned by authority: but the act is already valid within it

(d) It is not void as a despotic act outside of " republican form of government." (*Fed. Const. art. IV*, § 4, 5; *Howard's U. S. R. The license cases.*)

V. The prohibition is valid within the express grant of ·" legislative powers," and also upon the fundamental principles of political society and government. There are no limitations upon the legislative power, except in the state and federal constitutions. 1. As to the express grant. The grant is unlimited in its terms. (*Const. of* 1777, § 2.) " The supreme legislative power within this state shall be vested in two separate and distinct bodies of men." (*Const.* 1822, *art.* 1, § 1.) " The legislative power of this state shall be vested in a senate and assembly." (*Const. of* 1846.) The terms " legislative power " and " the supreme legislative power," are identical in effect and import the *whole* power. The power as large in substance as it can be conceived in idea—the sovereign and transcendent power of legislating for all coming generations and ages of the state in all the exigencies of society and affairs. Under the constitution, the state government takes all its powers not expressly or by necessary implication withheld. The legislative department was formed by British colonists on the model of the British parliament, and is coextensive with the power of parliament except as limited by the restrictive articles. The parliament was omnipotent. (*Coke,* 4 *Inst.* 36; *Lord Camden,* 19; *St. Tr.* 1066; 1 *Black. Comm.* 160, *et seq.; Sydney on Govt. ch.* 3, § 44-5-6; *De Lolme on Const. ch.* 3, 7, 8; *Kent,* 1 *Com.* 320; *Story,* 2 *Com. on Const. p.* 15, § 432-3; 7 *J. R.* 488-9; *Dash* v. *Van Kleek, per Spencer, J.;* 3 *Dallas,* 396, *Colden and wife* v. *Bull, per Iredell, J.;* 2 *Kern.* 212, *per Denio, J.;* 24 *Wend.* 250, *People* v. *Fisher per Bronson, J.;* 21 *Wendell,* 563; 1 *Hill,* 344; *Br. Leg. Max.* 6.)

2. The legislative authority, thus asserted by the most eminent jurists and judicial writers, results from the very nature of civil society and government. (1.) Society is founded on

the paramount law of self preservation. Its organism should therefore arm it against all internal and external foes. To that end there must reside somewhere in it the power to determine what is hostile to society, and what means shall be used to repel the danger. (*Sydney on Govt. Supra, Rosseau Soc. Camp. ch. IV; Rutherford's Inst. Book* 11, *ch.* 3, § 1 *to* 5; *Guizot's Hist. Rep. Govt.* 442.) In a pure democracy, that power resides in the collective people. In modern political societies, and especially in those formed on the English model, that sovereign power is lodged in the legislative department. (*See authorities under the first subdivision.*) It is confessedly lodged in no other department in our American system. Wherever lodged it may be as ample as when created by the collective people in a democracy. The people in a representative government, lose none of their collective force, but delegate it and exert it through their representatives. If the people have not delegated the power in question, it is because they did not possess it; and if they did not possess it, an express constitutional grant could not confer it upon the legislature. As the creative, energetic, perpetual providence of the state, having to provide for and preserve it through all changes, exigencies and ages of its existence, the legislative sovereignty must be vast, comprehensive, undefined. (2 *Hamilton's Works,* 457.) "The contingencies of society are not reducible to calculations; they can not be fixed or bounded even in imagination. Will you limit the means of your defence when you can not ascertain the extent or force of the invasion?" (*id.* 457.) "When you have divided and nicely balanced the departments of a government; when you have strongly connected the virtue of your rulers with their interests; when in short you have rendered your system as perfect as human forms can be, you *must* place confidence, you must give power," (and *see the numbers of the Federalist by Hamilton and Madison. Also for various illustrations of sovereign power, see* 1 *Bl. Com.* 48–9, 51–2, 147; *Vattel, Book* 1, *ch.* 1, § 42; *id. ch.* 3, § 26, 38; *id. ch.* 20, § 240, 244; *Grotius, De Jure Belli et Pacis, book*

1, *ch.* 14, §7; *id. Book* 3 *ch.* 22, § 7; *Puffendorf, L. Nat. and Nat. Book* 8, *ch.* 5, § 1, 3, 4, 6, 7; *Thomas's Univers. Jur.* 165–6, 170–1.)

(2.) The transcendent character of the legislative power is proved by various other considerations. (a.) The office of written constitutions is not to create but to distribute the powers of government, and to limit them when absolute discretion may be dangerous. (b.) The retrictions upon legislative power are enumerated in the constitution. *Expressio unius exclusio est alterius.* (c.) The restrictions are upon the fundamental points, and upon the only points where limitation was deemed necessary, practicable or safe. (d.) Those restrictions have been added and removed from time to time by constitutional amendments as the people have deemed necessary. (e.) Some of the legislative powers are admitted to have no limit but discretion; such as the power of war, of taxation, &c., which are far more potent for destruction than that of prohibitory legislation. (f.) The whole domain of legislation is one of policy, opinion, discretion—and discretion is in its very nature, *exclusive.* 1. *Executive* discretion, (12 *Wheaton,* 28.) 2. *Judicial* discretion. It is a settled principle of the courts, that error does not lie upon a judgment in a matter of discretion. 3. *Legislative* discretion, (3 *Paige, Beekman* v. *Sar. & Schen. R. R. Co.*) The legislature is the exclusive judge of the necessity for taking private property for the *quasi* public use of a rail road. 4. The principle seems to be a universal one in our jurisprudence. (1 *How. U. S. R.* 110; *Lawrence* v. *Minturn, per Curtiss, J.*) " It (a jettison,) will be deemed to have been necessary for the common safety, because the person to whom the law has entrusted authority to decide upon and make it, has duly exercised that authority. (g.) The limitation of the executive and judicial departments, which have no capacity to make laws. They only interpret, apply and execute those made by the legislative department. (h.) The judiciary has no rule but the constitution, by which to test the validity of a statute. Beyond that, the conflict is

one of opinion which is too uncertain and fluctuating for so high an exertion of the judicial power. (i.) It is no answer to say, that a power so absolute is susceptible of abuse. That is true of all the powers of all the departments. The remedy lies in official responsibility, in short terms of office, and in the power to impose constitutional restrictions. This is the *vis medicatrix* of the representative system, and fully adequate to correct the occasional aberrations of power to which the best governments are liable.

(3.) The legislation on the subjects of crime and police, in England and by the state and federal legislatures, has been uniformly in accordance with these principles from the easliest times. Crimes are offences against society and to be punished, not compensated or protected. (2 *J. R.* 457; *The People* v. *Barker,* 4 *Cow.* 686, *S. C.*) There is no constitutional distinction between *malum prohibitum* and *malum in se.* The codes of crimes and and all health and police laws stand upon this basis. And the principle applies equally to laws affecting the person and property. (4 *Bl. Com., ch.* 13, " *Of offences against the public health and the public peace or economy.*" 2 *R. S.* 881, *title* " *Misdemeanor.*" 1 *R. S.* 848, *title* " *Regulations for preserving the public health;*" *id.* 818, *title* " *Quarantine,*" &c., *in the port of New York;* 2 *R. S.* 6, " *Of the internal police of the State,* 21 *titles; see title* 9, " *Of Excise,*" &c; 2 *R. L. of* 1813, *p.* 368, § 1, *p.* 369, § 83, *for destruction of buildings to prevent spread of fire;* 18 *Wend.* 126, *The Mayor* v. *Lord;* 2 *Denio,* 461, *Russell* v. *The Mayor;* 5 *Mass. R.* 437, *Commonwealth* v. *Sessions of Norfolk;* 9 *id.* 388, *Same* v. *Sessions of Middlesex; Laws regulating intramural burials,* &c., 7 *Cowen,* 588, *Stuyvesant* v. *New York, id.* 388, *Vanderbilt* v. *Adams;* 2 *Metc.* 329, *Commonwealth* v. *Dana;* 12 *Pick.* 184, *Baker* v. *Boston;* 11 *Metc.* 58-9; 6 *id. Commonwealth* v. *Tewksbury;* 33 *Maine,* 560, *Preston* v. *Drew.*) Prospective appropriations of private property for public use. ( 17 *Wend.* 649, *Multon* v. *Furman street, S. C. in Court of Errors, in* 1842; *Jackson* v. *Brooklyn, Hicks* v. *Brooklyn, Court of Errors in* 1843.) Incidental damage to property in making public improvements.) 1 *Comst.*

195, *Radcliff's Exrs.* v. *Brooklyn.*)    Excise laws. (1 *R. S.* 85; *Laws* 1845, *p.* 322, *No license act;* 5 *Denio,* 70, *People* v. *Townsey,* 1 *Gray R.* 1, *Fisher* v. *McGive;* 5 *How. U. S. R.* 504. *The license cases, per Taney, Ch. J., p.* 577; *McLean, J., p.* 591; *Grier, J., p.* 631-2; *The People* v. *Quant, in 4th dist.; The People* v. *Wynehamer, in 8th dist.*

VI. The mode of trial and adjudication prescribed by the act is constitutional.   Section 1 of art. 1 of the state constitution does not secure a common law jury in all cases affecting liberty and property.   The judgment of any competent court, whether of impeachment or admiralty, or equity or of law, by a single judge, or referee, or statute jury, is a "judgment of his peers" in numerous cases.   Trial by jury has been "heretofore used" in the sense of section 2 of art. 1, in trials of offences under the grade of "infamous crimes."   Trial by a common law jury is secured by the constitution only in the case of capital or otherwise infamous crime. (*Const., art.* 1, § 6; *Forsyth Hist. of Trial by Jury, ch.* 5, § 3; *ch.* 7, § 3; *ch.* 9, § 2; *Creary on the Const.* 148 *to* 153 *and notes; id.* 166, 170, 208 *to* 228; *Bill of Rights,* § 12; 1 *Barn. & Ad.* 405.)   The offences defined by the prohibitory act are not "infamous crimes," and the trial in such cases may be by a single magistrate or a statute jury. (4 *Bl. C.* 5,) " In common usage, the word " crimes " is made to denote such offences as are of a deeper and more atrocious dye; while smaller faults and omissions of less consequence are comprised under the general name of misdemeanors." Misdemeanors are punishable only by fine and imprisonment in a county jail. (2 *R. S., Misdemeanors.*)   Infamous crimes are punishable by death and imprisonment in a state prison. (*See* 2 *R. S.* 886, § 34-5-6-7, *for definitions of* "*felony,*" "*crime,*" "*offence,*" *and* "*infamous crime.*")   The distinction between " crimes " and " infamous crimes " is already marked. (*Fed. Const. art. V. of Amendments State Const., art* 1, § 6; *and see* 2 *Cowen,* 815, *Murphy* v. *The People; id.* 819, *note, Jackson* v. *Wood;* 5 *Wend.* 251, *People* v. *Goodwin;* 15 *id.* 451, *Rathbun* v. *Sawyer;* 10 *id.* 446, *Matter of Smith;* 1 *Hill,* 355, *Duffy* v. *The People;* 6 *Hill,* 75, *S. C.;* 24 *Wend.* 337, *Lee* v. *Tillosson; The*

*People ex rel. Booth* v. *Fisher, in 7th dist.; The People* v. *Wynehamer, in 8th district.*)

VII. The seizure and the judgment of fine and forfeiture were authorized by the constitution and the act. There was due process of law.

VIII. The judgment of the Supreme Court should be reversed and that of the Special Sessions affirmed.

*John A. Lott*, for the defendant.

I. Neither the sale of the champagne wine nor keeping the same for sale was prohibited.

The section of the act, by which the offence is created, (section I,) expressly declares that it " shall not apply to liquor, the right to sell which in this state is given by any law or treaty of the United States."

The right to sell imported liquor is so given. (*McCulloch* v. *The State of Maryland*, 4 *Wheaton*, 316; *Brown* v. *State of Maryland*, 12 *Wheaton*, 419, &c.; *License Cases*, 5 *Howard's Rep.* 504, &c.)

This exception applies to the liquor itself without reference to the quantity or condition in which it may be sold, or the persons by whom the sale may be made and is not restricted to liquor while in the " original packages" in the hands of the importer.

There is nothing in the section requiring or justifying any other meaning to the term " liquor," when used in the last clause containing the exception, than that given to it, when used in the first clause containing the prohibition. The reference to the laws and treaties of the United States is manifestly, not for the purpose of restricting the mode of sale, but merely for the purpose of designating the kind of liquor exempted from the application of the section.

The provision in the twenty-second section declaring that the act shall not " be construed so as to prevent the importer of foreign liquor from keeping or selling the same in the

original packages, to any person authorized by this act to sell such liquors" is not in conflict but in entire harmony with this construction of the first section.

It may, indeed, be rendered superfluous and nugatory, but that will not authorize a more restricted meaning to be given to the clause containing an exception from the highly penal provisions of this act than the language and terms of the clause itself give to it.

II. If the exception be so construed as to permit the keeping and selling imported liquor only by the importer, in the original packages, then the act is repugnant to the constitution of the United States, and acts of congress passed under it.

(a.) It is a direct interference with the power of congress to regulate commere with foreign nations. (*Constitution of U. S. s. 8, sub. 4.*)

" Commerce is intercourse; one of its most ordinary ingredients is traffic. Sale is the object of importation and is an essential ingredient of that intercourse of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, as importation itself. It must be considered a component part of the power to regulate commerce. The right to sell is connected with the law permitting importation as an inseparable incident." (*Opinion of Chief Justice Marshall, Brown* v. *State of Maryland, above cited.*)

Any state law, therefore, prohibiting or restricting the sale of an article imported prohibits or restricts, to the same extent, its introduction into the country as a necessary consequence. No goods could be imported if the sale of them after importation was prohibited

The law in question if applicable to imported liquor, prohibits its sale as an article of commerce and general traffic.

Section 22 permits the sale to a limited class of purchasers, only (to such persons as are authorized by the second section of the act to sell,) for certain specific purposes.

If, however, the exception in the first section be so construed

The People v. Toynbee.

as not in terms to limit a sale of the liquor in the " original packages" by the importer to such a restricted class of purchasers, yet its effect and practical operation is the same.

No other persons could buy it for the purpose of selling it or keeping it to be sold, as the effect of a sale by the importer, would be immediately to subject it, (although still contained in the original packages) to the provisions of the act and make the purchaser liable to all its penalties.

This would defeat the object for which it is imported, and thus the power of congress to authorize this traffic, although given in the most comprehensive terms with the intent that its efficacy should be complete, would cease at the point where its continuance is indispensable to its value. A law producing such results is repugnant to such power and void.

(b.) It is also an interference with the power of congress to levy and collect duties, imposts and excises.

The necessary effect of the law is to prevent the importation of foreign liquors, and thus deprive the general government of raising revenue, by the imposition and collection of duties.

III. The act is repugnant to the constitution of the state of New York.

1. It is in violation of the first section of article I, which provides that " no member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers," and also of that part of the sixth section which declares that no person shall be deprived of liberty or property without due process of law.

The terms " the law of the land," and " due process of law," mean a proceeding according to the course of the common law; a trial according to the known and established forms and rules for establishing guilt or determining the title to property and a judicial sentence, not merely a statutory enactment passed for accomplishing the wrong. (*Taylor* v. *Porter*, 4 *Hill, p.* 145–6; *Sackett* v. *Andros*, 5 *Hill, p.* 358–9; *Westervelt* v. *Gregg*, 2 *Kernan*, 209–212; *Hoke* v. *Henderson*, 4 *Dev. p.* 1; *Green* v. *Biddle*, 8 *Wheaton*, 175; *Bronson* v. *Kinzee*, 1 *How*

*Rep.* 11; *Holmes* v. *Lansing*, 3 *John. Cases*, 75; *Morse* v. *Gould*, 1 *Kernan*, 281; *Greene* v. *Briggs*, 1 *Curtiss*, 311; *Saco* v. *Wentworth*, 37 *Maine Rep.* 165; 1 *Black Com. p.* 55; 2 *Kent Com. p.* 13; 2 *Inst. p.* 50; 3 *Story on the Constitution, s.* 1783.)

The property affected by the act is not only declared by section 25 to be a public nuisance, but the natural and unavoidable effect of the act, is to render the property useless and unavailable to its owners as an article of traffic, and in the manner in which it has heretofore been used and disposed of.

At the time the act took effect, great numbers of the citizens of the state had by manufacture and purchase, acquired and become the owners of, and, therefore, had vested rights in large quantities of liquors, wines and ales, the value of the principal part of which, will be entirely destroyed, if the act be sustained. (*See sections* 1, 4, 6, 7, 10, 12.)

The twelfth section of the act authorizes and directs the seizure of property to an unlimited amount by every sheriff, under sheriff, deputy sheriff, constable, marshal or policeman, however irresponsible, without making any provision for securing the return thereof, to the owner in any case.

2. The fifth section of the act directing a trial of the accused by a court of Special Sessions, is in violation of the sixth section of article I, of the constitution, which provides that no person shall be held to answer for an infamous crime, (except in cases of petit larceny and certain other specified cases,) unless on presentment or indictment of a grand jury.

The term "infamous crime," as there used, is not restricted to "offences punishable with death, or by imprisonment in the state prison," (the meaning given to it when used in a statute.)

Petit larceny and the other excepted cases, are not so punishable, yet by well settled rules of interpretation, they are, by force of the exception, included in that term, as understood by the framers of the constitution.

The offence created by this act, works a forfeiture of the prohibited article, and renders the offender incompetent to act as a juror upon any trial under the provisions of the act. This

The People *v.* Toynbee.

renders the offence infamous. ( 1 *Phillips on Evidence, p.* 28, *&c.*; 4 *Blackstone's Com. p.* 94, 97; *Starkie on Evidence, part* 4, *p.* 714; 1 *Chitty's Criminal Law, p.* 599.)

3. The fifth section of the act, limiting the right of trial to six jurors, is also a violation of section two of the same article, which declares that " a trial by jury in all cases in which it has been heretofore used, shall remain inviolate forever." The right thus secured, is a trial by twelve men. (*Taylor* v. *Porter,* 4 *Hill,* 140; *Cruger* v. *The Hudson River Railroad Co.* 2 *Kernan R.* 198; *see also, Debates in the Convention of* 1846, *Argus edition, p.* 423, *and Atlas edition, p.* 118, 125, 544 *and* 547.)

To obviate objections urged against the requirements of a trial by a jury in all cases, a provision was added to this section of the constitution, that it " may be waived by the parties in all civil cases, in the manner to be prescribed by law."

The right of such waiver is excluded in criminal cases.

The words " in all cases in which it has been *heretofore used,*" do not restrict this right to such offences only as were known at the formation of the constitution, and were then triable by a jury. Such a construction would give the legislature the power to deprive a party of a jury on the trial of all offences subsequently created, although punishable by imprisonment in the state prison, or even with death.

The provision should be construed in favor of liberty and personal rights, and so as to secure the right of trial by twelve men in all cases.

At the time when this constitution was adopted, the jurisdiction of courts of Special Sessions had become limited to petit larceny and a few other small offences, and even as to those, a trial by a jury of twelve men could always be secured by giving bail to appear at the next court of criminal jurisdiction.

4. But even if the act in question authorized the defendant to give bail, and thus secure a trial by a jury of twelve men, it was, nevertheless, a violation of the constitution. It imposes a restriction on the right not contemplated or justified by that instrument. (*Greene* v. *Briggs,* 1 *Curtis,* 311.)

5. That provision of the constitution is also violated by rendering an entire class of citizens incompetent to serve as jurors upon trials of offences under the act in question, thus depriving the party of the full privilege of a trial secured in other cases. (*See opinion of Judge Pitman in Greene* v. *Briggs, above cited.*)

6. It violates *section* 5 *of art.* 1 of the constitution, by imposing excessive fines, and inflicting unusual punishments.

The fourth section of the act provides that every person who shall violate any provision of the preceding sections, shall forfeit all the liquor kept by him in violation of either of those sections, without regard to its value. The same section also directs the commitment of the defendant in case of default of payment of any part thereof, until the same are paid, " *not less* than one day per dollar of the amount unpaid," thereby authorizing the imprisonment of the defendant for an unlimited time.

Previous to the passage of this act, it was expressly provided that no conviction of any person for any offence whatever except upon an outlawry for treason, should work a forfeiture of any goods, chattels, lands, tenements, hereditaments, or of any right or interest therein. (2 *R. S.* 701, § 22.)

The punishment inflicted, therefore, is unusual and in clear contravention of the provision referred to.

IV. The power of the legislature in the enactment of laws, (whatever it may be in other countries,) is not unlimited in this; it is restricted not only by the written constitution, but by limitations implied from the nature of our form of government; and the judiciary is the only tribunal by which it can be peaceably determined whether the legislature have transcended their authority. (*Opinion of Justice Chase, in Calder* v. *Bull, in* 3 *Dallas R.* 386; *Opinion of Chief Justice Marshall, in Fletcher* v. *Peck,* 6 *Cranch,* 77; *Opinion of Bronson, J., in Taylor* v. *Porter,* 4 *Hill,* 146; *Opinion of Senator Tracy, in Bloodgood* v. *The Mohawk and Hudson Railroad Co.,* 18 *Wend.* 56, 61, 62, 63; *Opinion of Justice Hosmer, in Goshen* v. *Stonington,* 4 *Conn.* 225; *Wilkinson* v. *Leland,* 2 *Peters,* 654; *Smith's Commentaries on Statutory and Constitutional Construction,* 258 *t·,* 289; 2 *Kent's Commentaries,* 329–349, *Lecture* 34, 2*d ed* )

Those provisions of the act which authorize the seizure and destruction of private property, which prohibit its use for the purposes to which it is generally and principally appropriated, which declare that to be a nuisance and a crime which is in itself harmless, which assume the power to determine physical facts, as that all distilled and malt liquors are intoxicating, are unwarranted by any thing contained in the constitution, or in the delegated powers of the legislature.

What is a nuisance, and what is intoxicating, are questions for adjudication and not subjects of legislation; and the legislature have as much authority to declare wine when used for sacramental purposes, a nuisance, and pure water intoxicating, as to determine such to be the characteristics of liquor, when kept to be used as a beverage.

The prohibition by the act, so far at least as regards domestic liquor, is in effect absolute. No person can sell any quantity of it, except for purposes for which it is only accidentally useful, and in comparatively small quantities, and the sale of it, even then, is authorized by a limited portion of the community only, under restrictions inconsistent with the proper disposition of property.

V. No offence is charged in the complaint. When an exception from the operation of a general provision is embodied in that provision, or in other words, when exceptions are in the enacting part of the law, it must be averred in the charge, that the act complained of does not fall within the exceptions. (2 *Saunders on Pleading*, 257; *Vavasour v. Ormond*, 6 *Barn & Cres.* 431; 1 *Chitty's Crim. Law*, 283, 284, 285; *Teel* v *Fonda*, 4 *Johns.* 304; *Rex* v. *Jarvis*, cited in a note to *Rex* v *Stone*, 1 *East*, 639; *Hirn* v. *The State*, 1 *Ohio St. Rep.* 15.)

In the act in question, the exception in the first section by which the offence is created is included in the general expression " except as hereinafter provided," in the first line of the section, but more particularly in the last clause of it. The section was therefore in effect, that intoxicating liquor (except liquor the right to sell which in this state is given by any law of the United States) should not be sold or kept for sale, and

by the rule referred to, it should have been alleged in the complaint that the liquor sold was not in the exception.

VI. The justice erred in refusing to take the bail offered by the defendant for his appearance at the next court having criminal jurisdiction. The right to give such bail is incident to all· cases triable in a court of Special Sessions, and the refusal to receive it rendered the subsequent proceedings void. (*See opinion of Judge Rockwell in the People* v. *Berberrich, at the end of the case.*)

VII. The judgment of the court of Special Sessions was erroneous: 1st, because it does not specify whether the appellant was convicted of selling the brandy or champagne, or which of them he was convicted of having in his possession with intent to sell; nor for what he was adjudged guilty of a misdemeanor; nor for what he was sentenced to pay the penalty of fifty dollars: 2d, because it adjudged that the champagne wine, which was proved to be imported liquor, was forfeited and should be destroyed: 3d, because it adjudged that the defendant stand committed until the fine and costs be paid, not exceeding fifty-six days.

VIII. The judgment of the court of Special Sessions was contrary to law and the evidence, and was properly reversed, and the judgment of the Supreme Court should be affirmed with costs.

SELDEN, J.—The question which lies at the threshhold of this case, and which should be determined in advance of every other, is, whether the act for the prevention of intemperance, pauperism and crime, considered in reference to its object, the means adopted to secure that object, and its alleged effect in virtually annihilating a large amount of property, is void, as being without the pale of legislative power. It is claimed, 1. That irrespective of any positive restrictions, the principles of natural equity and justice set bounds to the power of the legislature, which are transcended by this law. And. 2. That it is in conflict with the express provisions of the constitution.

The People *v.* Toynbee.

In examining this subject, speculative opinions in regard to the wisdom of the act, or the beneficial results likely to flow from it, can have nothing whatever to do with a question, which depends upon abstract principles of governmental law; principles which can not be moulded to meet the views or interests of any portion of the people. It is a question not of expediency, but of power.

Every sovereign state, possesses within itself, absolute and unlimited legislative power. It is true, that as government is instituted for beneficent purposes, and to promote the welfare of the governed, it has no moral *right* to enact a law which is plainly repugnant to reason and justice. But this principle belongs to the science of political ethics, and not that of law. There is no arbiter beyond the state itself, to determine what legislation is just. Whatever, therefore, is to be declared by the ultimate power of a state, as there can be no appeal, must in view of the law, be taken to be just and right. The union of the functions of making and deciding upon laws, constitutes of necessity absolute legislative power. While, therefore, the *right* of a sovereign state to pass arbitrary and tyrannical laws may, its legal *power* can not, be denied. This is self-evident, and needs no proof. I speak of course, of a state as a whole, where all its powers are *concentrated* in the hands of the people at large, or of one or more of its members.

It follows, that if a society of people wishing to form an organized government, should simply create the three essential departments, vesting *the whole* executive power in one, the legislative in another, and the judicial in a third; as the three departments combined would possess all the powers which belonged to the people in their collective capacity, the legislative department could make any law which the people themselves could have made, arbitrary, oppressive or otherwise; unless, under such a distribution of the governmental powers, some authority is vested in the judiciary, to pass upon the propriety or justice of the laws.

But it is evident that this is a legislative and not judicial power. It is necessarily to be exercised in the first instance

at least, when the law is passed, and obviously constitutes the most essential portion of the duty of the legislature itself. To suppose the same power vested in the judiciary, tends to confound the distinction between the two departments. Besides, when exercised by the latter, it becomes a supervisory and appellate power, and *thus virtually subversive of all legislation.* It is clear, therefore, in my judgment, that in a perfectly *natural and simple* distribution of the governmental powers, it is not within the province of the judiciary to pronounce *any* act of the legislature void. It may, however, acquire this right through an artificial distribution of those powers, by means of the organic law.

Let us look then at our state constitution. Section 1, art. 3, declares that " The legislative power of this state, shall be vested in a senate and assembly." This means of course *the whole* legislative power. The words are general and unlimited, nothing is reserved. It was decided by this court, in the case of *Barto* v. *Himrod,* (4 *Seld.* 483,) that the people had parted with all their power of legislation, except in the single case provided for in art. 7, sec. 12.

Why then, as it has been shown that the people could make any law just or unjust, is not the legislature equally absolute? It is because by other clauses in the constitution hereafter to be noticed, a portion of this absolute power has been transferred to the judiciary. Not, it is true, in direct terms; but the constitution, being the result of legislation by the people themselves, before parting with their power, is the paramount law. When, therefore, any law passed by the legislature, conflicts with this, the judiciary pronounces between them, as it does between the acts of two successive legislatures, and the paramount law prevails. It will be seen, that, in this mode, a restriction upon the power of the legislature is effected, without confounding the distinction between the two departments, as the judiciary continues to exercise only its appropriate judicial functions.

To determine then, the extent of the law-making power, we have only to look to the provisions of the constitution. It has,

and can have no other limit than such as is there prescribed, and the doctrine, that there exists in the judiciary some vague, loose and undefined power, to annul a law, because in its judgment it is " contrary to natural equity and justice," is in conflict with the first principles of government, and can never I think be maintained.

I am aware that some eminent judges, when the question was not before them, have expressed a belief in the existence of such a power; but no court has ever, I believe, assumed to declare an explicit enactment of the legislature void, on that ground.

Blackstone, in his commentaries, after referring to the doctrine advanced by some other writers on this subject, that acts of parliament, " contrary to reason," are void, says: " But if the parliament will positively enact a thing to be done which is unreasonable, I know of no power in the ordinary forms of the constitution that is vested with power to control it; and the examples usually alleged in support of this sense of the rule do none of them prove, that when the main object of a statute is unreasonable, the judges are at liberty to reject it; for that were to set the judicial power above the legislative, *which would be subversive of all government."* (1 *Black. Com.* 91.)

Christian; in his commentary upon this passage, says, " When the signification of a statute is manifest, *no authority,* less than that of parliament, can restrain its operation." (*See note to Black.*) These authorities, it is true, have reference to the British constitution; but the following relate to those of our own country.

Lieber, in his work on civil liberty and self-government, says, that the state legislatures have " the right, as a general rule, to do all that seems necessary for the general welfare, and is not *specially prohibited."* He suggests no exceptions. (*See chap.* 15, § 25.)

Mr. Justice Irdell, in the case of *Calder* v. *Bull* (3 *Dall* 386,) when this question was incidentally considered, uses the following emphatic language: " If then a government, com-

posed of legislative, executive and judicial departments, were established by a constitution which imposed no limits on the legislative power, the consequence would inevitably be, that whatever the legislative power chose to enact, would be lawfully enacted; and the judicial power could never interpose to pronounce it void."

Chief Justice Church, of Connecticut, also, in the case of *The City of Bridgeport* v. *The Housatonic Railroad Company,* (15 *Conn. R.* 475,) expresses his views thus: " There may not often be any great difficulty in determining what are the principles of natural justice, nor what would tend to undermine that which theorists may suppose to be the fundamental principles of the social compact, especially by those who acknowledge the precepts and obligations of revealed religion; yet these principles are not always of easy and undoubted application to the infinitely varied forms of human action; and we know of no other municipal power, which can more safely make such application, than the legislature; and as a court, although we might dissent from its conclusions, yet *we disclaim any right to disregard them,* for no other reason, that we might consider them unreasonable, impolitic or unjust."

I agree with the learned chief justice, that this power of determining what laws are expedient and just, which must of necessity be lodged somewhere, may be as safely reposed in the legislature, which returns its power so frequently through the elections into the hands of the people, as in the judiciary. The remedy for unjust legislation, provided it does not conflict with the organic law, is at the ballot box; and I know of no provision of the constitution, nor fundamental principle of government, which authorizes the minority, when defeated at the polls upon an issue involving the propriety of a law, to appeal to the judiciary, and invoke its aid, to reverse the decision of the majority, and nullify the legislative power.

This brings me to the consideration of the second ground, upon which it is claimed, that the law, as a whole, is void, viz: that it is inconsistent with the letter, or spirit, of the express provisions of the state constitution. The particular

The People v. Toynbee.

clauses with which it is alleged to conflict, are those which provide: 1. That "no member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers." 2. That no person shall "be deprived of life, liberty or property without due process of law."

The first of these clauses, which had its origin in Magna Charta, brief as it is, embodies the most essential guaranties against the exercise of arbitrary power which that instrument contained. Its meaning, as there used, is plain, when we consider that it was the result of a struggle which had lasted for more than a century, between the English people and the Norman kings, who had supplanted the laws and customs of the Anglo-Saxons and established in their place the prerogatives of royalty. The English yeomanry, at whose instance this clause was inserted, meant by the terms "law of the land" the ancient Saxon or common law. To put any other construction upon it, it would render the clause utterly unmeaning. At that period in English history, the king exercised legislative power; and if by "law of the land" was meant any law which the king might enact, the provision was a nullity.

But the meaning was rendered more clear by the paraphrase of this article of Magna Charta, which was inserted in a subsequent statute, securing privileges to the people, passed in the reign of Edward III, in which the clause "but by the law of the land, or the judgment of his peers," was changed to the words "without being brought to answer by due process of law."

This change shows that the object of the provision was, in part at least, to interpose the judicial department of the government, as a barrier against aggressions by the other departments. Hence, both courts and commentators in this country, have held, that these clauses, *in either form,* secure to every citizen, a judicial trial, before he can be deprived of life, liberty or property. (*Hoke* v. *Henderson,* 4 *Den.* 1; *Jones* v. *Perry,* 10 *Yerger,* 59; *Taylor* v. *Porter,* 4 *Hill,* 140; *Embury* v. *Conner,* 3 *Coms.* 54; 2 *Kent Com.* 13; 3 *Story Com. on the Cons.* § 1783.)

65

Does the statute in question then, deprive any class of citizens of their property, without " due process of law?" Property is the *right* of any person to possess, use, enjoy and dispose ui a thing. The term, although frequently applied to the thing itself, in strictness means only the *rights* of the owner in relation to it. (*Bouvier's Law Dic.* 1 *Black. Com.* 138; *Webster's Dic. &c.*) A man may be *deprived* of his property in a chattel therefore, without its being seized, or physically destroyed, or taken from his possession. Whatever subverts his *rights* in regard to it, annihilates his property in it. It follows, that a law which should provide in regard to any article in which a right of property is recognized, that it should neither be sold, or used, nor kept in any place whatsoever, within this state, would fall directly within the letter of the constitutional inhibition; as it would in the most effectual manner possible deprive the owner of his property, without the interposition of any court, or the use of any process whatever.

It may be said that the constitutional provision in question can not in the nature of things apply to a case, where a law enacted for beneficent purposes, operates *directly* upon its subject and thus accomplishes *per se* the end in view, that in such a case, it is impossible to interpose any judicial action between the enactment and its execution; and that the clause can only apply to cases where there is to be some manual interference with the rights of person or of property.

But there is no such limitation in the constitution; and the few guarantees it contains should not be curtailed by any narrow or refined process of interpretation. Such a construction would virtually nullify the provision; as the most oppressive and tyrannical ends may be accomplished, by simply withdrawing from individual rights the protection of law. All vested rights to franchises would be placed by this interpretation, so far as the state constitution is concerned, entirely at the mercy of the legislature. To give the clause, therefore, any value, it must be understood to mean that no person shall be deprived by any form of legislation or governmental action, of either life, liberty or property, EXCEPT AS THE CONSEQUENCE of some

judicial proceeding, appropriately and legally conducted. It follows that a law, which by its own inherent force, extinguishes rights of property, or compels their extinction, without any legal process whatever, comes directly in conflict with the constitution.

Does the act in question do this?

I shall consider the objections to the first four sections, which embrace the prohibitory features of the act, with the specific penalties annexed to its violation, by themselves, as they have no necessary connection with those made to the subsequent sections. If these four sections *virtually deprive* the owners of spirituous liquors of their property, without legal process, they are void, if my interpretation of the constitution is sound.

It is not sufficient that they impair *the value* of the property, in ever so great a degree, because this *destroys* no right. It leaves to the owner *unimpaired,* his *right* to keep, to use and dispose of the article. It does not therefore *deprive* him of any right of property. All regulations of trade with a view to the public interests, may more or less impair the value of property, but they do not come within the constitutional inhibition, unless they *virtually* take away and destroy those rights, in which property consists; this destruction must be for all substantial purposes *total.* Not that a merely *colorable* preservation, of some minute and trival interest, would uphold the act. A substantial right of property must be saved; and the provisions must be such, as may fairly be considered as intended *to regulate,* rather than subvert and destroy the property.

What then is the general scope and object of the first four sections of the act? Plainly, to prohibit the sale of intoxicating liquors, for all except *mechanical, chemical* and *medicinal* purposes and to limit their sale for those purposes, to a particular class of persons. Is there any thing in these objects, which *if properly carried out* would transcend the limits of the legislative power? I think not. The legislature, in my judgment, possesses the right to prescribe the places where the

persons by whom, and the purposes for which, spirituous liquors may be sold, provided that under color of doing this, it does not virtually deprive the owner of his property in them.

So far as the places where, and the persons by whom, sales may be made, this act is perhaps more stringent than the excise laws which it supersedes. The increase of rigor *is in the purposes* for which such liquors may now be sold. But the privilege of selling for "*mechanical, chemical* and *medicinal* purposes," is not, I think so trivial, as to be justly regarded as merely *colorable.* The consumption for the chemical and mechanical arts, must be considerable, and that for medicinal purposes, will be found, I apprehend to be still greater. Besides, as the law would operate to check the manufacture and importation of liquors, the stock on hand would, if permitted, have been ultimately required for purposes deemed by the law itself legitimate.

If then the law had suffered the liquors on hand when it went into effect, to be gradually absorbed by the then privileged uses, the prohibitory features contained in the first four sections would not, I think, have conflicted with the constitution. But there is one provision in the first section of the act which, when taken in connection with the fourth section, can not I think be reconciled with any just views of legislative power.

That section declares, in substance, first, that intoxicating liquors, except as afterwards provided, shall neither be sold, or kept for sale, or with intent to be sold, in any place whatsoever; nor be given away, or kept with intent to be given away, anywhere but in a private dwelling house. These provisions, although they abrogate the right of sale, do not prohibit the liquors from being kept, provided no design is entertained of selling them; nor do they prohibit their being *used* by the owner. So far the section may not conflict with the constitution. But it proceeds: " nor shall it be kept or deposited *in any place whatever*, except in such dwelling house as above described, or in a church or place of worship for sacramental purposes, or in a place where either some chemical, or mechani

The People *v.* Toynbeé.*

cal, or medicinal art, requiring the use of liquor, is carried on as a regular branch of business; or while in actual transportation from one place to another, or stored in a warehouse, prior to reaching its place of destination.

This last clause is not qualified by any provision as to the *intent* with which the liquors are kept. It is an *absolute prohibition* against their being kept *anywhere,* but in the excepted places; although the owner may have no intention either to use, sell, or give them away; and the fourth section declares a violation of this clause to be a *misdemeanor,* and imposes a penalty of fifty dollars for the first offence.

Now what, under this law, is the condition of a person having spirituous liquors on hand, on the day when the law takes effect? These liquors, or the rights of the owner in them, are property, and as such entitled to the protection of the constitution. What then is the owner to do? If he does *nothing* he is guilty of a misdemeanor; because it is a violation of the act, *to keep* the liquors *anywhere,* out of the excepted places, without reference to the interest of the owner. Unless therefore he obtains the right to sell, or deposits the liquor in one of the excepted places, he must *destroy* it, or be liable to indictment and punishment as a criminal. The act reduces him to this alternative. It does not permit him to dispose of his liquors, even to those authorized to sell. In this respect, it is inconsistent with itself. It admits the value of such liquors for certain purposes, and yet prohibits their sale for those very purposes.

If it be conceded that the legislature has not the power to pass a law directing a *sheriff* or other officer *to destroy* these liquors, wherever he can find them, without any process whatever, then the constitutionality of the provision under consideration, can not I think be maintained; because, there can be no material difference between directing an officer to destroy them, and directing the owner himself to do it; nor between enacting, in so many words, that the latter shall destroy them, and placing him in a situation which subjects him to conviction and punishment as a criminal, unless he does it. How is

it possible *to deprive* a man more effectually of his property, than to enact that he shall be deemed guilty of a misdemeanor, and be liable to a penalty, *if he keeps it for any* purpose? This is precisely what the legislature has in substance done; since the only doors of escape left open to the owner are entirely illusory. They are, either to qualify himself under sections two and three to sell, or to deposit his liquor in one of the excepted places.

As to the first, he may not be able to obtain the necessary security, or to make oath that he does not use intoxicating liquor as a beverage. The law does not make such use a crime; nor does the constitution withdraw its protection in consequence of it. Such a man, then, although disposed to submit to the law, and not to sell for any unauthorized purpose, can not save his property, even for those purposes which the law itself sanctions.

It may be said that he may remove the liquors to one of the excepted places. This might be done in some instances, and in small quantities. Some men own dwelling houses, and some do not. Some might have access to mechanical or manufacturing establishments, and some would not. But the legislature has no power to compel the destruction of even the smallest quantity of liquor without a previous judicial condemnation. The idea of depositing *all* the liquor on hand when the law took effect, in those excepted places, is plainly illusory. The suggestion that the owners might save their property by exportation is equally so. Admitting the right of the legislature to compel any class of citizens to remove their property out of the state, we can not know, judicially, that an article, the sale of which is prohibited, and which is declared a nuisance in our own state, would be admitted as an article of merchandise into any other.

While, therefore, I do not question the constitutionality of the general objects of the prohibitory law, and fully concede the power of the legislature to prohibit the sale of intoxicating liquors, for all except mechanical, chemical and medicinal purposes, I can not admit that it has the right to compel their

*immediate and unconditional destruction,* as is, I think, substantially done by this law. The guaranties of the rights of property, which the constitution affords, as my investigations in this case have satisfied me, are slender at the best, and I am unwilling so to interpret as entirely to nullify them.

There is one other argument in connection with this branch of the case, which I will notice here. It is said that the legislature has the conceded power to authorize the destruction of private property in certain cases for the protection of great public interests; as for instance, the blowing up of buildings during fires, and the destroying of infected articles in times of pestilence; and that the legislature is necessarily the sole judge of the public exigency which may call for the exercise of this power.

The answer is, that the legislature does not in these cases *authorize* the destruction of property; it simply *regulates* that inherent and inalienable right which exists in every individual to protect his life and his property from *immediate* destruction. This is a right which individuals do not surrender when they enter into the social state, and which can not be taken from them. The acts of the legislature in such cases do not confer any right of destruction which would not exist independent of them; but they aim to introduce some method into the exercise of the right. (*See the able opinion of Senator Sherman in Russell v. The Mayor of New York, 2 Denio, 461.*)

It has never yet been judicially decided in this state, so far as I am aware, that the officers upon whom statutes of this kind purport to confer power to destroy buildings to prevent the spread of fires, would be justified in exercisng the power in a case where it could not be properly exercised independent of the statute; and it may well be doubted whether the legislature can add to the extent or force of the natural right.

Again, the enactment of quarantine laws, by force of which not only is property destroyed, but personal liberty restrained, is the exertion, by the body politic, of the same power of self-preservation which is possessed by individuals. Their justification rests upon the *immediate* and *imminent* danger to life

and health which they are enacted to avert. If we admit the truth and force of all the reasoning upon which the statute before us is based, it will still be impossible to bring it within the range of this power. As well might an individual argue, that because he has a right to protect his life or property from immediate destruction, he has therefore a right to resort to any measures he may deem necessary to guard against remote and contingent dangers. It is clear, therefore, that no argument drawn from these and kindred enactments, can be of any weight in determining the question here.

The conclusion to which I am thus brought, is necessarily subversive of the entire law in its present form. For, although when only a part of an act is unconstitutional, and that part is entirely separable from the remaining portion, the court will limit its condemnation to the part which conflicts with the constitution, yet this can not be done, where, as in this case, in a single section, several acts in relation to the same subject matter, and connected in one sentence are forbidden, and in another section all these acts are indiscriminately declared to be crimes, and *one common penalty* is annexed to each. The same provision can not be both valid and void, as would be the case if it should be held that the penalties imposed by section four could be enforced as to part of the acts prohibited in section one, and not as to others.

It may be said that although the legislature has not the power to annihilate *existing rights* of property in any article, it may nevertheless make it unlawful to acquire such rights in future; and may therefore enact that all rights of property in a particular article, *thereafter acquired*, shall be null, and that the article itself shall be destroyed; and hence that the present law may be enforced as to all rights not shown to have existed when the law took effect.

But conceding the power of the legislature to make such a law, it can not support the present act, which operates indiscriminately upon all rights of property in the article in question, without regard to the time when they were acquired.

To hold the law valid and operative as to property acquired

after it took effect, and void as to rights previously existing, would tend to the constant recurrence of the question before the courts as to its constitutionality, and to *repeated judgments* of condemnation of the law. There are serious objections to this on the grounds of public policy, which requires that collusions between the different departments of government should be as few and as brief as possible. If the law was so framed, that proof on the part of the defendant that his rights of property involved in the case had existed before the act took effect, could be construed into a defence under the act itself, this objection would be removed. But it is clearly otherwise. Such proof would have no tendency to exempt the defendant or his property from the penalties of the law, except by calling upon the court to pronounce it unconstitutional. Thus the courts would be required over and over again to declare the same legislative provisions both valid and void, as applicable to different classes of cases. This has been in some instances, but with doubtful propriety, tolerated in purely civil cases, but never, I believe, in respect to penal and criminal legislation.

It is not only liable to the objection already suggested of calling into repeated action the ultimate judicial power of passing upon the validity of the acts of a coordinate branch of the government; but it would tend directly to encourage experimental legislation. If the legislature may in a single provision encroach *ad libitum* upon the constitution, without other effect than to call upon the courts to limit its operation to cases within the purview of legislative power, nearly all motive for a careful regard of constitutional rights in legislation would be removed and an onerous burden imposed upon the courts. The general rule on this subject is that where part of a law is in conflict with the constitution, and that part is entirely separable from the residue, so that other portions of the law can be enforced without reference to it, there the unconstitutional part only will be condemned. But where the legislative provision is indivisible, and the necessary discrimination has, as in this case, to be made at the trial, so that the rights invaded can only be protected by *repeated* judgments against the validity of the law,

although there may be a class of cases to which it might properly apply, the provision is wholly void. The law, therefore, must be revised and the proper discrimination made, before it can be enforced.

I shall notice but a single additional point arising upon that portion of the law, which is designed to enforce its penalties.

Section 17 contains important provisions which are made applicable to every prosecution under the act; and if the law is to be revised, it is undoubtedly desirable that the views of this court upon that section should be known. The question arising upon it is in my view of greater importance than any other which the law presents; as it goes to test the value of those clauses of the constitution, upon which our rights of personal security rest.

The second branch of the section provides that upon the trial of every complaint under the act for an unlawful sale of liquor, the defendant shall not be permitted to justify under the second section, (the only way in which it is possible to justify,) unless he shall: 1. Admit the sale, which, by the previous clause, is converted into *prima facie* evidence of guilt: 2. Swear to his innocence, *i. e.* his belief as to the use which the purchaser intended to make of the liquor: and 3. State the reasons upon which his belief was founded.

Can this provision be reconciled with that clause in section six article one of the constitution, which provides that " in any trial in any court whatever, the party accused shall be allowed to appear and defend in person and with counsel," taken in connection with the provision in the same section that no persons shall " be deprived of life, liberty or property " without due process of law?" Of what value is this right " to appear and defend " if the legislature can clog it with conditions and restrictions, which substantially nullify the right? The constitution says, every man shall have a right " to defend." The legislature says you may defend, *provided* you first admit yourself *prima facie* guilty. Can these provisions be reconciled?

In *Greene v. Briggs*, (1 *Curtis R.* 311,) Curtis, J., speaking of the provisions of the constitution of Rhode Island that no

person shall " be deprived of life, liberty or property, unless by the judgment of his peers, or the law of the land," says: " The exposition of these words, as they stand in Magna Charta, as well as in the American constitutions, has been that they require ' due process of law,' and in this is necessarily implied and included the right *to answer and contest the charge*, and the consequent right to be discharged from it unless it is proved."

He subsequently adds: " It follows that a law which should preclude the accused from answering to and contesting the charge, *unless he should first give security* in the sum of two hundred dollars, with two sufficient sureties, to pay all fines and costs, and which should condemn him to fine and forfeiture unheard, if· he failed to comply with this requisition, would deprive him of his liberty or property, not by the law of the land, but by an arbitrary and unconstitutional exertion of the legislative power."

The conditions imposed upon the right of defence by section seventeen of our act are far more onerous and embarrassing, than that condemned by the learned justice in this passage, and if he is right, it is impossible to sustain the section against this objection.

It is equally clear that it conflicts with another clause of the constitution. Section six, article one, declares that no person " shall be compelled to be a witness against himself." Section seventeen says to the defendant, you shall not go into your defence unless you will not only swear to your innocence, but make yourself a witness and testify to all the circumstances of the case. This, for all substantial purposes, is compelling him to be a witness against himself. It is doing precisely that against which the object of the constitution was to protect him, viz: searching his conscience under *the constraint of an oath*. There is no difference between compelling a man to be sworn, and assuming his guilt if he refuses; because his refusal has precisely the same effect as if he was sworn and testified to his own guilt; *it convicts him*. Indeed, the provision

is virtually compulsory, as there could scarcely be a more effectual way of compelling a man to be sworn than to say that, unless you consent you shall be convicted and punished as a criminal. The section, therefore, is in this respect, in my judgment, a plain violation of the constitution.

But a point of still greater interest arises upon the first branch of section seventeen, which provides that " upon the trial of any complaint commenced under any provision of this act, proof of the sale of liquor shall be sufficient to sustain an averment of an unlawful sale, and proof of delivery shall be *prima facie* evidence of sale."

There are two classes of cases upon which this provision operates with great severity. Although the act does not prohibit the keeping of spirituous liquor or the giving it away, in a private dwelling, yet by this clause, the mere delivery is made *prima facie* evidence of an unlawful sale, *without exception as to place.* No one, therefore, can in his own house, give a glass of wine to a friend without thereby affording *prima facie* evidence to convict him of misdemeanor. Other portions of the act purport to respect the sanctity of the private domicil of the citizen; but its innermost recesses are penetrated by this provision, and acts of mere kindness or courtesy are converted into proof of guilt.

But the operation of the section upon another class is equally onerous. I mean the class of licensed venders. Sections two and three expressly authorize certain persons to sell, who are required to give ample security not to violate any provision of the act, and yet, by force of the clause in question, every sale *they* make affords *prima facie* evidence to convict them. The act presumes against the innocence of its own selected agent, and will not permit this presumption to be rebutted, until such agent consents to make himself a witness in the case.

This provision raises the vital question as to the value of that clause in the constitution which secures to every man charged with crime a trial by " due process of law." The

most important guaranties of individual right which our constitution affords, are concentrated in this single phrase. As we have already seen, the expression " due process of law " first appeared in a statute of Edward III, as a paraphrase of the words " by law of the land " *per legem terræ* in Magna Charta; and from that day to this, both forms of expression have been held to refer to the *common law,* as distinguished from statutory enactment.

Sir Matthew Hale says: " The common law is sometimes called, by way of eminence, *lex terræ,* as in the statute of Magna Charta, chap. 29, where certainly the common law is principally intended by those words, *aut per legem terræ,* as appears by the exposition thereof in several subsequent statutes, and particularly in the statute of 28 Edward III, chap. 3, which is but an exposition and explanation of that statute." ( 1 *Hale's Hist. Com. Law,* 128.)

Lord Coke also in his commentary upon Magna Charta, puts the same construction upon the words. (2 *Inst.* 45, 50.)

The courts in this country have held the same. Chief Justice Ruffin, speaking of this clause in the constitution of North Carolina, in the case of *Hoke* v. *Henderson,* (4 *Dev.* 1,) says that " such legislative acts as profess in themselves directly to punish persons, or to deprive the citizen of his property, without trial, before the judicial tribunals, and a decision upon the matter of right, as determined by the laws, under which it vested, *according to the course, mode and usages of the common law,* as derived from our forefathers, are not effectually laws of the land for these purposes."

To the same effect is the language of Judge Bronson in *Taylor* v. *Porter,* (4 *Hill,* 140,) where, in speaking of section one, article seven of the constitution of 1821, he says: " The meaning of the section then seems to be, that no member of the state shall be disfranchised, or deprived of any of his rights or privileges, unless the matter shall be adjudged against him upon trial had *according to the course of the common law."*

If this interpretation is correct, and it is sustained as well

by history as by judicial authority, the clause in question was intended to secure to every citizen, the benefit of those rules of the common law, by which judicial trials are regulated; and to place them beyond the reach of legislative subversion. They are indeed virtually incorporated into the constitution itself, and made thereby a part of the paramount law. Trials, therefore, at least such as are criminal, are to be regulated and conducted in their essential features, not by statutes, but by the common law. This the constitution guarantees. Precisely how far the legislature may go, in changing the modes and forms of judicial proceeding, I shall not attempt *to define, but I have no hesitation in saying that they can not* subvert that fundamental rule of justice, which holds, that every man shall be presumed innocent until he is proved guilty. This rule will be found specifically incorporated into many of our state constitutions, and is one of those rules which in our constitution are compressed into the brief, but significant phrase, "due process of law."

Can section seventeen be reconciled with this rule? It provides, that upon every prosecution under the act, proof of a sale of liquor shall sustain an averment of an unlawful sale, and proof of delivery shall be *prima facie* evidence of a sale. It is plain, that at common law, the legal presumption would be directly the reverse of that declared by the act. Where the common law would presume innocence, this act presumes guilt. Either the guaranty of a judicial trial according to the course of the *common law* is a nullity, or this provision is void.

But I am prepared to go further, and to hold, that *all* those fundamental rules of evidence, which in England and in this country, have been generally deemed essential to the due administration of justice, and which have been acted upon and enforced by every court of common law for centuries, are placed by the constitution beyond the reach of legislation. They are but the rules which reason applies to the investigation of truth, and are of course in their nature unchangeable. If it does not follow, that, to determine what they are, as applica-

ble to judicial proceedings, is a judicial and not a legislative power, still they must necessarily be included in the phrase " due process of law." If this be not the true interpretation of the constitution, if the legislature in addition to declaring what *acts* and what *intentions* shall be criminal, can also dictate to courts and juries the *evidence,* and change the legal presumptions upon which they shall convict or acquit, there is no barrier to legislative despotisms, and the separation of the legislative and judicial departments of the government, the guaranty of trial by jury, and of a trial according to the course of common law, have all failed to afford any substantial security to individual rights.

I am unable, therefore, to resist the conviction that in both branches of section seventeen the legislature has transcended the just limits of its power, and trenched upon the constitutional province of the judiciary.

The judgment of the Supreme Court should be affirmed.

A. S. JOHNSON, J.—The defendant was arrested by a policeman of the city of Brooklyn and carried before a police justice of that city, and was there charged with having sold and kept for sale, and having in his possession with an intent to sell, intoxicating liquor, viz: brandy and champagne. The complaint was made in writing and on oath, and stated in addition to the matters already mentioned, that the complainant saw Toynbee actually engaged in selling intoxicating liquor, to wit: brandy, in violation of the act for the prevention of intemperance, pauperism and crime; that the offence consisted in selling one glass of brandy and one bottle of champagne; that the complainant arrested Toynbee and had brought him before the justice to answer the charge; and that at the same time and place he seized the said brandy and champagne and the bottles in which they were contained, and had stored the same in some convenient place to be disposed of according to the act before mentioned. The defendant asked to be discharged, upon the ground that the act was unconstitutional, and upon the further ground that the complaint did not

set forth facts enough to show that any offence had been committed by the defendant. His application was denied. He then objected to being tried by a court of Special Sessions, and offered bail for his appearance at the next court having criminal jurisdiction. The justice overruled his objection, refused to take bail and required the defendant to plead. Upon his plea of not guilty, evidence was given showing that he kept a tavern, in the bar room of which he had sold a glass of brandy and a bottle of champagne as mentioned in the complaint, and that the champagne was imported liquor. The court found him guilty of selling and having in his possession with intent to sell intoxicating liquors, as charged in the complaint, adjudged him guilty of a misdemeanor, imposed upon him a fine of $50 and $5·87 for costs, and committed him until the fine and costs should be paid, for not exceeding fifty-six days; and further adjudged that the liquor seized was forfeited and that a warrant should be issued for its destruction.

Upon appeal to the Supreme Court, at general term in the second district, the judgment was reversed. From that judgment of reversal an appeal has been taken to this court.

This proceeding was instituted under the provisions of the act for the prevention of intemperance, pauperism and crime. The sections which particularly relate to it are substantially these; omitting such parts as do not bear upon this particular case: " It shall be the duty of every sheriff, under sheriff, deputy sheriff, constable, marshal or policeman, to arrest any person whom he shall see actually engaged in the commission of any offence in violation of the first section of this act, and to seize all liquor kept in violation of said section, at the time and place of the commission of such offence, together with the vessels in which the same is contained, and forthwith to convey such person before any magistrate of the same city or town, to be dealt with according to law, and to store the liquor and vessels so seized in some convenient place, to be disposed of as hereinafter provided. It shall be the duty of every officer by whom any arrest and seizure shall be made, under this section, to make complaint on oath against the person

arrested, and to prosecute such complaint to judgment and execution." (*Laws of* 1855, *p.* 340, *&c.* § 12.) "All liquors and vessels in which they are contained, which shall have been found and seized in the possession of any person, who shall have been arrested for violating any provision of the first section and not claimed by any other person, shall, upon conviction of such person of such offence, be adjudged forfeited." (*Sec.* 13.) When any liquor seized under any provision of the act shall be adjudged forfeited as provided in any section of the act, it shall be the duty of the magistrate (after the determination is become final,) forthwith to issue a warrant commanding that the liquor be destroyed. The officer to whom the warrant shall be delivered, is to destroy it and make a return of the destruction, and then an execution is to be issued to sell the vessels which contained the liquor. (*Sec.* 10.) Every justice of the peace, police justice, county judge, city judge (certain other officers in New York,) and in all cities where there is a Recorder's Court, the recorder, has power to issue process, to hear and determine charges and punish for all offences under the act and to hold courts of Special Sessions for the trial of such offences. The section proceeds: "such court of Special Sessions shall not be required to take the examination of any person brought before it upon charge of an offence under the act, but shall proceed to trial as soon thereafter as the complainant can be notified." Power to adjourn, for good cause, is given for not exceeding twenty days. At the time of joining issue, and not after, either party may demand trial by jury, in which case the magistrate is to cause a jury to be summoned and empanneled, as in other criminal cases in courts of Special Sessions. (*Sec.* 5.) No person who shall have been convicted of any offence against any provision of the act, or who shall be engaged in the sale, or keeping of intoxicating liquors, contrary to the act, shall be competent to act as a juror upon any trial under any provision of the act. (*Sec.* 16.) Upon the trial of any complaint under the act, proof of the sale of liquor shall be sufficient to sustain an averment of an unlawful sale,

and proof of delivery shall be prima facie evidence of sale. (*Sec.* 17.) A violation of any provision of the first section, is made a misdemeanor. The guilty party is to forfeit all liquors kept by him in violation of the section and is to be further punished by a fine of $50, for the first offence; for the second, by a fine of $100 and thirty days' imprisonment; for the third and every subsequent offence, by a fine not less then $100, nor more than $250, and by imprisonment for not less than three, nor more than six months. The defendant is likewise to pay all costs and fees provided in the act, and in default of payment of any such fine, costs and fees, or any part thereof, the defendant is to be committed until the same are paid, " not less than one day per dollar of the amount unpaid." (*Sec.* 4.) Such is the machinery of legal process by which according to the act, any person who violates the prohibition of the first section is to be brought to punishment, when the proceeding takes the form of a personal prosecution. Other and not less stringent, and extraordinary methods of procedure, are provided when the prosecution is directed against the liquor alone, to procure its destruction. With these, however, we have in this case no cause to occupy ourselves.

The prohibitory clause itself, upon which these proceedings are founded, constitutes the first section. Omitting certain exceptions from the prohibition, which will be afterwards noticed, it provides that intoxicating liquor shall not be sold, or kept for sale, or kept with intent to be sold, by any person in any place whatsoever. That it shall not be given away, nor be kept with intent to be given away in any place whatsoever, except in a dwelling house, in no part of which any tavern, store, grocery, shop, boarding house or victualing house, or room for gambling, dancing, or other public amusement or recreation of any kind is kept, that it shall not be kept, or deposited in any place whatsoever, except in such a dwelling house as is above described, or for sacramental purposes in a church or place of worship; or in a place where either some chemical, or mechanical or medicinal art, requiring the use of liquor, is carried on as a regular branch of business, or while

in actual transportation from one place to another, or stored in a warehouse prior to its reaching the place of its destination. By an exception in this same section, liquor may be given away as a medicine by physicians pursuing the practice of medicine as a business, or for sacramental purposes. The section concludes with a provision, that it shall not apply to liquor, the right to sell which in this state is given by any law or treaty of the United States.

By sections 2 and 3, persons answering the description, doing the acts and taking the oaths prescribed theeinr may be licensed to keep for sale and sell intoxicating liquor and alcohol, for mechanical, chemical or medicinal purposes, and wine for sacramental use.

By section 22, the act is not to be construed to prevent the sale of cider in quantities not less than ten gallons; nor to prevent the manufacturer of alcohol, or of pure wine from grapes grown by him, from keeping or from selling such alcohol or wine nor the importer, of foreign liquor, from keeping or selling the same in the original packages, to any person authorized by the act to sell such liquors; nor to prohibit the manufacture or keeping for sale, nor from selling burning fluids of any kind, perfumery, essences, drugs, varnishes, nor any other article which may be composed in part of alcohol, or other spirituous liquors, if not adapted to use as a beverage, or in evasion of this act.

The foregoing clauses contain, in substance, the prohibition of the act with the exceptions which qualify its effect.

Two other provisions are necessary to be quoted as they bear upon the rights which the owner of liquor has in it and the modes in which he may assert those rights. The first is at the close of section 16, and declares " that no person shall maintain an action to recover the value or possession of any intoxicating liquor sold or kept by him, which shall be purchased, taken, detained, or injured by any other person, unless he shall prove that such liquor was sold according to the provisions of the act, or was lawfully kept and owned by him.

The People v. Toynbee.

The other clause is at the end of section 24, and provides that " all liquor kept in violation of any provision of the act shall be deemed and is thereby declared to be a public nuisance."

The question whether this act is within the authority conferred by the people of this state upon the legislature, or whether it is in conflict with the restraints which the people have in the constitution imposed upon the law making power. is presented by the case before us. It is, perhaps, not absolutely necessary to the decision of the cause, that we should pass upon this question in its broadest aspect. It has not been usual for the courts of the United States to consider questions of constitutional law, when the particular case before them could be disposed of on other grounds. I have no doubt that this practice is grounded upon a wise consideration of the delicate nature of the authority which courts of justice exercise in declaring the acts of the legislative power void as being in conflict with the constitution. The practice, however, rests in the discretion of the judges, and may therefore be departed from when the public interests seem to require that course. It is not unknown to us that much controversy has existed in respect to the constitutionality of this law, and that the whole body of the community is divided in opinion upon it; that these different opinions are maintained with great ardor by those who entertain them, and that very important interests, both public and private, depend upon the solution which the question shall receive at our hands. The question has been presented to the Supreme Court, at different general terms, and conflicting decisions have resulted, so that no private person, nor any public officer, can say what is his duty in the premises. This state of things not only allows us to depart from the ordinary practice, but in my judgment makes it our imperative duty to consider, and finally dispose of the question involved.

In this state all power which is exercised over the people is derived from them, whether it be legislative, executive or judicial; they have conferred it, or it can have no legal existence. To the legislature they have entrusted " the legislative power

The People *v.* Toynbee.

of this state," as the words of their grant declare, (*Const., art.* 3, § 1.) In the same instrument they have imposed upon all the agents to whom they have committed the powers of the government certain restrictions, which by the intrinsic and original power of the people limit the exercise of authority. Some of these restrictions are in terms imposed upon the legislative power; others equally restrictive upon legislative and executive authority, are expressed in the form of declarations of rights belonging to the people.

In my judgment, legislative power is subject to no other control. In every organized society there must exist somewhere an ultimate power of determining what the interest of the people require, which power having been exercised, its decision is subject to no review, save by the whole body of the society. Upon no part of human action does the law operate more directly, or more legitimately than in respect to actions which are regarded as hostile to the public welfare. In respect to such actions, where no constitutional limit is imposed upon legislative power, legislation is supreme. The right to make such laws lies at the very foundation of society and is intrusted, and ought to be intrusted, as I think, to the law making power. The determination as to what actions shall be forbidden, necessarily involves discretion, to be exercised in view of all the circumstances which at the time are operating upon the welfare of the people. Of such questions the legislature which exercises the power of the people, which is in immediate communication with them, which knows both their desires and their needs, is the ultimate judge. I am speaking solely of the question of power. I am not to judge of the wisdom of the laws under review, or of their reasonableness or abstract justice. Sitting in the exercise of mere judicial power, which is strictly limited to answering the question, what *is* the law, and has not been entrusted with saying what it ought to be, I have no authority to weigh the justice of legislation and to allow or disallow it as I shall find the scale to turn. Certainly that which the interest and welfare of the people required to be made law, was proper to be enacted, and was within the scope

of legislative power if no constitutional inhibition exists. If a court is to judge of such a question at all, it must go over the same field upon which the legislature has acted. It must consider the occasion of the law, the existence of the evil, the suitableness of the remedy. "A person exercising a judicial capacity, is neither to apply to original justice, nor to a discretionary application of it. He goes to justice and discretion only at second hand, through the medium of some superiors. He is to work neither upon his opinion of the one, nor of the other, but upon a fixed rule, of which he has not the making, but singly and solely the application to the case." Whether a given action shall be prohibited, and under what penalty, whether loss of life, or liberty or of fine, must depend upon an infinite variety of facts, and upon the consideration of the evil the action occasions or is likely to occasion to the people. What machinery has a court of justice sitting to determine questions of law, with which to investigate such a question? Upon this subject I can add nothing to the strength and clearness with which, that which I regard as the true legal view of the powers and duties of judges, is stated by Senator Verplanck in *Cochran* v. *Van Surlay*, (20 *Wend.* 381.) "It is difficult upon any general principles to limit the omnipotence of the sovereign legislative power, by judicial interposition, except so far as the express words of a written constitution give that authority. There are indeed many dicta, and some great authorities, holding that acts contrary to the first principles of right, are void. The principle is unquestionably sound, as the governing rule of a legislature in relation to its own acts, or even those of a preceding legislature. It affords a safe rule of construction for courts in the interpretation of laws admitting of any doubtful construction, to presume that the legislature could not have intended an unequal and unjust operation of its statutes. Such a construction ought never to be given to legislative language, if it be susceptible of any other more conformable to justice; but if the words be positive and without ambiguity, I can find no authority for a court to vacate or repeal a statute on that ground alone. But it is only in express constitutional provi-

sions, limiting legislative power and controling the temporary will of a majority by a permanent and paramount law, settled by the deliberate wisdom of the nation, that I can find a safe and solid ground for the authority of courts of justice to declare void any legislative enactment."

From a pretty early period the evils of drunkenness have attracted legislative attention. Frequent instances of legislation on the subject are to be found among the English and our colonial laws. With these examples and with the constant practice of our own government in restraining sales of liquor in small quantities, except by license, I feel it difficult to understand how it can be maintained that the use of intoxicating liquors is not a subject upon which legislation can constitutionally take place, to prevent injuries to the health and morals of the people; and if it is a proper subject of legislation at all, I do not know where is to be found (unless in the constitution) any fixed rule by which a court can undertake to say that the absolute use of liquors as a beverage, would be beyond the authority of the legislature. Nor do I find in the constitution any thing which can be applied to restrain the passage or affect the validity of such a law. Certainly the declaration that " no person shall be deprived of life, liberty or property, without due process of law," nor that other, "no member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers," would have no application to such a law. The right to drink liquor stands upon no higher ground than the right to do many other things which the legislature finds contrary to the public welfare, and can scarcely be secured under those general words, unless upon grounds that would completely tie the hands of the legislature from nearly all interference with the conduct of men. But the legislature have not seen fit to put their lislation into this form. They have not directly prohibited the use of liquors as a beverage, but have attempted to bring about the result which they had in view by forbidding substantially the traffic in liquors, except for other purposes than drinking. This prohibition, if enforced,

would have a clear tendency to prevent the use of liquor as a drink, because it would render the procurement of it for any such purpose nearly impossible, unless the seller should violate the law. Indeed, the only ways in which liquors could be procured by any person, without an infraction of the law by some one, upon the construction put by the prosecution upon the terms of the act, would be either to manufacture them, or, perhaps, to buy from an importer in the original packages of importation. If the law in question went no further than to impose such a prohibition upon sales, operating alike upon all the inhabitants of the state, I should find it difficult to say that it, by its own mere force, deprived any person of his liberty or property, within the meaning of the constitution. Such a law would clearly diminish the value of the property, nay almost deprive it of value and render it nearly useless, within this state for the purposes of traffic, for which it was mostly acquired, but it would not touch the thing, nor would it destroy the property, considering that term in its legal sense as descriptive of those rights which men acquire to and over things, and which constitute the legal notion of property.

It is quite obvious that the end which the legislature had in view, assuming that to have been the prevention of the evils of drinking, may be attained by direct and also by indirect measures. For instance, prohibiting intoxication would be one means. Prohibiting drinking at all would be another, one degree more remote. Prohibiting the sale for drinking, is still more remote. So legislation may be carried on farther and farther from the object directly in view, as by prohibiting the sale for any purpose, prohibiting the manufacture, prohibiting even the existence of liquor, or even of those things from which liquor can be produced. Now, though the general purpose is entirely legitimate and within the scope of legislative authority, and though direct legislation for the attainment of that end might be free from objection, yet it by no means follows that measures operating remotely, though conducive to the end in view, may not violate the restraints of the constitution. The purpose, origin and history of declaratory bills of rights, are

The People *v.* Toynbee.

admirably stated by Chancellor Kent in his commentaries. (§ 1, 2 *Kent Com.* 1.) After stating that the absolute rights of individuals may be resolved into the right of personal security, the right of personal liberty, and the right to acquire and enjoy property, he says: " These rights have been justly considered, and frequently declared by the people of this country, to be natural, inherent and inalienable." After showing how early and how strenuously they were asserted by our colonial ancestors, he says, that " upon the formation of the several state constitutions, after the colonies had become independent states, it was in most instances thought proper to collect, digest and declare in a precise and definite manner, and in the shape of abstract propositions and elementary maxims, the most essential articles appertaining to civil liberty and the natural rights of mankind." (*p.* 7.)

" But the necessity, in our representative republics of these declaratory codes, has been frequently questioned, inasmuch as the government in all its parts, is the creation of the people, and every department of it is filled by their agents duly chosen or appointed according to their will, and made responsible for maladministration. It may be observed on the one hand that no gross violation of those absolute private rights which are clearly understood, and settled by the common reason of mankind, is to be apprehended in the ordinary course of public affairs; and as to extraordinary instances of faction and turbulence, and the corruption and violence which they necessarily engender, no parchment checks can be relied on as affording, under such circumstances, any effectual protection to public liberty. When the spirit of liberty has fled, and truth and justice are disregarded, private rights can be easily sacrificed under the forms of law. On the other hand, there is weight due to the consideration, that a bill of rights is of real efficacy in controlling the excesses of party spirit. It serves to guide and enlighten public opinion, and to render it more quick to detect, and more resolute to resist attempts to disturb private right. It requires more than ordinary hardiness and audacity

of character, to trample down principles, which our ancestors cultivated with reverence, which we imbibed in our early education, which recommend themselves to the judgment of the world by their truth and simplicity and which are constantly placed before the eyes of the people, accompanied with the imposing force and solemnity of a constitutional sanction. Bills of rights are part of the muniments of freemen, showing their title to protection. (2 *Kent Com.* 8.)

The clauses of the bill of rights before cited, together with the provisions in respect to jury trials, contain the substance of the provisions of chapter twenty-nine of Magna Charta. These clauses have always received a large and liberal interpretation in favor of private rights and against power.

The expression, " by the law of the land," is interpreted by Lord Coke to mean, " by the due course and process of law;" (2 *Inst.*, 46,) and this last expression is afterwards expounded to mean by indictment or presentment of good and lawful men, where such deeds be done in due manner, or by writ original at the common law. (2 *Ins.* 50.) In *Taylor* v. *Porter*, (4 *Hill*, 140) and in *Embury* v. *Connor*, (3 *Comst.* 511,) the meaning of these words was considered, by Bronson, J., in the Supreme Court and by Jewett, J. in this court, and they agree in the opinion that at the least " due process of law " imports a judicial trial, and not a mere declaration of legislative will, by the passing of a law. They agreed further in holding as both those courts held, that though private property could be taken for public use upon just compensation, yet for uses not public it could not be taken at all — neither by an act of legislation, nor in any other manner; or as Judge Bronson expressed himself, speaking with reference to that case of *Taylor* v. *Porter*, which presented the question of the constitutionality of taking a man's land to make a private road, " when one man wants the property of another, I mean to say that the legislature can not aid him in making the acquisition." The same doctrine, in substance, as to the authority of the legislature was affirmed in this court in *Powers* v. *Bergen*, (2 *Seld.* 358,) where the question arose upon an act of the legislature authorizing a sale

of lands by trustees not authorized by the will creating the trust. No necessity for the act of the legislature appeared either in the statute or aside from it, either on account of the infancy or other incapacity of the persons living who had vested or contingent interests in the estate, and the court held that the act was not within the powers delegated to the legislature, and that the sale in pursuance of it conferred no title. In that case Judge Jewett, who gave the opinion of the court, cites with approbation the language of Judge Story, in *Wilkinson* v. *Leland*, (2 *Peters*, 657,) who says: " The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred. At least no court of justice in this country would be warranted in assuming that the power to violate and disregard them, a power so repugnant to the common principles of justice and civil liberty, lurked under any general grant of legislative authority, or ought to be implied from any general expressions of the will of the people. The people ought not to be presumed to part with rights so vital to their security and wellbeing, without very strong and direct expressions of such an intention." The same construction was again given to these words " due process of law," by Denio and Edwards, JJ.; giving the opinion of this court in *Westervelt* v. *Gregg*, (2 *Kern.* 202). I do not refer to these cases as deciding that now before us, but only to show that without judicial investigation, without " due process of law," no act of legislation can deprive a man of his property, and that in civil cases an act of the legislature alone is wholly inoperative to take from a man his property.

An admirable statement of the constitutional doctrine as to the power of the legislature, both in the punishment and in the creation of offences, is contained in the opinion of Chancellor Sanford in *Barker* v. *The People*, (3 *Cowen*, 686). " The power of the legislature in the punishment of crimes, is not a special grant, or a limited authority to do any particular thing, or to act in any particular manner. It is a part of ' the legislative power of this state ' mentioned in the first sentence of

the constitution. It is the sovereign power of a state to maintain social order, by laws for the due punishment of crimes. It is a power to take life and liberty and all the rights of both, when the sacrifice is necessary to the peace, order and safety of the community. This general authority is vested in the legislature and as it is one of the most ample of their powers its due exercise is among the highest of their duties. When an offender is imprisoned, he is deprived of the exercise of most of the rights of a citizen; and when he suffers death, all his rights are extinguished. The legislature have power to prescribe imprisonment or death as the punishment of any offence. The rights of a citizen are thus subject to the power of the state in the punishment of crimes; and the restrictions of the constitution upon this, as upon all the general powers of government, are, ' that no citizen shall be deprived of his rights, unless by the law of the land or the judgment of his peers, and that no person shall be deprived of life, liberty or property without due process of law.' " " The power of the state over crimes is thus committed to the legislature without a definition of any crime, without a description of any punishment to be adopted, or to be rejected, and without any direction to the legislature concerning punishments. It is then a power to produce the end by adequate means; a power to establish a criminal code with competent sanctions; a power to define crimes and prescribe punishments by laws, in the discretion of the legislature. .But though no crime is defined in the constitution and no species of punishment is specially forbidden to the legislature, yet there are numerous regulations of the constitution, which must operate as restrictions upon this general power. The whole constitution must be supported, and all its powers and rules must be reconciled into concord. A law which should declare it a crime to exercise any fundamental right of the constitution, as the right of suffrage, or the free exercise of religious worship, would infringe an express rule of the system, and would therefore not be within the general power over crimes. Particular punishments would also encroach upon rules and rights established by the constitution

Though the legislature have an undoubted power to prescribe capital punishment and other punishments which produce a disability to enjoy constitutional rights, yet a mere deprivation of rights would, even as a punishment, be in many cases repugnant to rules and rights expressly established. Many rights are plainly expressed and intended to be fundamental and inviolable in all circumstances. A law enacting that a criminal should, as a punishment for his offence, forfeit the right of trial by jury, would contravene the constitution; and a deprivation of this right could not be allowed in the form of a punishment. Any other right thus secured as universal and inviolable, must equally prevail against the general power of the legislature to select and prescribe punishments. These rights are secured to all: to criminals as well as to others; and a punishment consisting solely in the deprivation of such a right would be an evident infringement of the constitution, and all punishments which do not subvert such rules and rights of the constitution are within the scope and choice of the legislative power."

The legislature then has power to create offences, and to declare in what cases the consequences of loss of life, of liberty and of property shall be attached to the commission of offences, they being ascertained by " due process of law " to have been committed. But the form of this declaration of right " no person shall be deprived of life, liberty or property, without due process of law," necessarily imports, that the legislature can not make the mere existence of the rights secured, the occasion of depriving a person of any-of them, even by the forms which belong to " due process of law." For if it does not necessarily import this, then the legislative power is absolute.

To provide for a trial to ascertain whether a man is in the enjoyment of either of these rights, and then as a consequence of finding that he is in the enjoyment of it, to deprive him of it, is doing indirectly just what is forbidden to be done directly, and reduces the constitutional provision to a nullity. For instance, a law that any man who, after the age of fifty years, shall continue to live, shall be punished by imprisonment or

fine, would be beyond the power of the legislature. It would be so upon the ground that he can not be deprived of life, liberty or property, without due process of law, and that the right to live and not be punished for living, was put by the declaration of right beyond the power of legislative interference. Upon the same principle a law which should make it a crime for men either to live in, or rent, or sell their houses, would fall within the same prohibition upon legislative authority. There may, then, in respect to offences attempted to be created by legislation, a question arise capable of being considered by courts of justice, whether the thing forbidden is an essential part of either of those secured private rights, so essential that without it the right can not exist at all. Such a question is undoubtedly of the most delicate nature, as well looking to the wide authority of legislation as to the intrinsic difficulty of distinguishing between the exercise of the clearly existing power to regulate the manner of enjoying these rights, and the exercise of an absolute and prohibited power directly to infringe upon them. A court of justice may well hesitate before such a question, and yet is bound to meet it when presented. A similar case of difficulty has arisen in the courts of the United States in respect to the acknowledged power of the states to regulate remedies for the enforcement of contracts, and the power prohibited to them by the constitution of the United States, of impairing by law the obligation of contracts There the remedy and the obligation so run into each other, that to draw a line between them seems almost impossible, yet the duty has been performed, and it has been held that, though the remedy may be altered by the state legislatures, yet that a substantial and reasonable mode of enforcement in the ordinary and regular course of justice, must be given to the party injured by the breach of the contract. The cases are stated and examined in *Morse* v. *Gould*, (1 *Kernan* 281). The rule is necessarily indefinite, for the conflicting rules so blend together in practice, that no other than an indefinite rule is possible. The same sort of question is presented in respect to the infringement by legislation of men's private rights, and the regu-

The People v. Toynbee.

lation of them, and their enjoyment. The substantial right can not be destroyed; its enjoyment is not an offence, and legislation can not make it an offence. At the same time the mode of enjoyment in its broadest sense, is subject to legislation, though it be affected very injuriously, provided a substantial right is left. Now, in respect to liquors, no lawyer can doubt that on the third of July they were property, in which the owner had the same right as in any other article of personal property; nor that since that time they remain property, and that as such they come under the protection which the constitution affords to property. The power of disposition or use in some way, or at least the right to keep and preserve, enters into every notion of legal property. To destroy the power of sale alone, does not indeed physically destroy the property, though it takes from it that quality which gives it its chief value, and for which its possession is mainly desirable. Still I am not prepared to say that the legislature may not under the constitution, take away the right of sale to the extent which this act contemplates. But by a general prohibition of sale, irrespective of quantity, and person and purpose, coupled with a prohibition, even to keep it, except in a dwelling house, where no store, &c., is kept, and in places where certain arts and trades are carried on, the legal existence which the law and the constitution designate as property is in my judgment broken up, and the private injury is as completely effected as if the thing itself were physically taken away.

The constitution does not make it a condition on which its protection is extended to property that its owner shall also own a dwelling house. They who owned liquor on the 3d of July, and who did not own, or could not procure the use of a dwelling house or other excepted place, were, without any act done on their part, made guilty of a misdemeanor, punishable by fine and forfeiture, unless they destroyed that which, by the same law, was recognized as property. Allowing it to remain where it happened to be was constituted an offence, and there was no way of escape, except by destroying the property, for the power to sell, even to persons licensed to sell again, was

taken away. That it may appear that this is no overstatement of the case, I will shortly restate the provisions of the law. With the trifling exceptions before stated, liquors are forbidden to be sold or kept with intent to be sold, or to be given away or kept with intent to be given away, except in a dwelling where no tavern, store or place of amusement is kept; or to be kept or deposited any where save in such a dwelling house, or in a church for sacramental purposes, or in some place where a chemical, mechanical or medicinal art is carried on as a business, or while in actual transportation from one place to another, or stored in a warehouse prior to reaching their place of destination. In addition to these prohibitions which together constitute a single scheme for dealing by law with this species of property, liquor kept contrary to them is declared to be a nuisance, and for an injury to it, or the taking it away from the owner, he can maintain no action, unless he proves that it was "lawfully kept and owned by him;" and as this lawfulness is made to depend, among other things, in all cases upon the non-existence of an intent to sell, and in some cases upon the non-existence of an intent to give it away, the nearly impossible burthen of making out these negatives is thrown upon the owners. This scheme taken together, in my judgment, is a scheme not of regulation, but of legal destruction of property, which, as much as any other, was under the protection of the constitution. It does not in its effect come short of a law authorizing any officer, or any one, directly, to destroy the liquor. Between directly authorizing the destruction, and telling the owner that he shall be fined, and his property destroyed, also, if he does not anticipate the action of the law and destroy it himself, I can not distinguish. If such a law as to liquors can stand, the same provisions may be made as to any other property; and if such be the power of the legislature, those words " no person shall be deprived of life, liberty or property, without due process of law," are no longer deserving of a place " among the muniments of freemen, as showing their title to protection."

There is no doubt a seeming anomaly in the result to which

I have come, that mere rights of property should stand in the way of criminal legislation. The only solution of the difficulty is to be found in the consideration that it may not have occurred to the convention who framed, or to the people who adopted the constitution, that in one and the same legislative act, an article which had always before been regarded as property, might be recognized as useful for some purposes, not dangerous in itself, nor evil, unless used as a drink, capable of sale by some people and the subject of property in the hands of every one who lawfully acquired it, and yet that the public interests might be deemed to require that the lawful owner should neither sell it, irrespective of his intent in selling it, nor keep it, irrespective of his intent in keeping it, unless he could procure a mere dwelling house to keep it in, on pain of fine and imprisonment and forfeiture. Had such a contingency occurred to them, it is altogether probable that they would have provided for it, either by narrowing the protection which the constitution extends to property, equally with life and liberty, if they deemed that expedient, or possibly by providing expressly for such legislation.

The prohibitions of the first section taken together, and they form but a single scheme, and are to be enforced by the same penalties, can not therefore, in my judgment, be upheld, at least in respect to property which had been acquired while there was no prohibition against the acquisition of such property. The future acquisition the legislature might, in my opinion, control, and I am not disposed to deny that they could have subjected such future acquisitions to the prohibitions this act imposes. But in this act they have made no discrimination. The provisions extend and were clearly meant to extend to all liquors. It is no part of the proof to make out the offence according to the statute to show that the liquors were acquired after the prohibitions became operative, nor is the fact that they were acquired before, any defence under the statute. The only way of defending against it, on the ground in question, is by asking to have it declared void. Laws in relation to civil rights are

sometimes held to be unconstitutional in so far as they affect the rights of certain persons, and valid in respect to others. This is done mainly upon the ground that the courts will not construe them to relate to such cases as the legislature had not power to act upon. To statutes creating criminal offences, such a rule of construction ought not to be applied, and I can not find any trace of its ever having been applied. It is of the highest importance in the administration of criminal justice, that acts creating crimes should be certain in their terms and plain in their application, and it would be in no small degree unseemly that courts should be called upon in administering the criminal law, to adjudge an act creating offences at one time valid and at another time void. It must, I think, stand as it has been enacted, or not stand at all. In my judgment, therefore, the first section of the act in question, with the penal clauses founded upon it, ought to be declared void.

The next question is as to the process of trial, condemnation, forfeiture and punishment, which the act introduces. I doubt much whether the clause of the bill of rights that no person shall be deprived of life, liberty or property without due process of law, necessarily imports a jury trial as part of all due process. If it does, then, unless all civil proceedings are out of the purview of the provision, and they were not thought to be in *Taylor* v. *Porter,* (4 *Hill,* 140,) and *Embury* v. *Conner,* (3 *Coms.* 511,) it seems difficult to say on what grounds equity proceedings, by which men are often deprived of property, can be sustained where no jury exists. The right to jury trial is secured by other sections of the bill of rights. If this portion gives it in all cases, then the others can hardly stand with it. For on looking at them, it is apparent that jury trials were intended to be continued where they had existed, and that cases were in contemplation in which jury trials did not and would not exist. I incline to the construction which Chancellor Kent gives in his commentaries, that " the better and larger definition of due process of law is, that it means law in its regular administration through courts of justice. (2 *Kent.* 13.) But it is not necessary, in my opinion, to pronounce upon this ques-

The People *v.* Toynbee.

tion, because the first part of article 1, section 2, " the trial by jury in all cases in which it has heretofore been used shall remain inviolate forever," is broad enough and efficacious enough to secure it. The expression, " in all cases in which it has heretofore been used," is generic. It does not limit the right to the mere instances in which it had been used, but extends it to such new and like cases as might afterwards arise. For instance, felonies, were triable only by jury. I do not doubt that all new felonies must be tried in that way, and that by force of this section; for section 6, which provides that no one shall be held to answer for a capital or otherwise infamous crime, except on indictment or presentment of a grand jury, does not, in terms, require a jury trial of the issue on the indictment. The other section does require it, as well in new felonies as in old, because they belong to the class of cases in which at the adoption of the constitution such a trial was used. Applying the principle to this case, we find that from 1830, at least, misdemeanors by violation of the excise laws were not triable in courts of Special Sessions at all (1 *R. S.* 682, § 25; 2 *R. S.* 711, § 1,) but in courts of General Sessions or of Oyer and Terminer, which were courts proceeding according to the course of common law. And moreover, even in cases of offences where the Special Sessions had jurisdiction, the defendant might always by giving bail, at least after 1830, secure to himself a right to trial by jury in the other courts. It does not at all affect this argument to say at an earlier period jury trial was not a right in such cases. The course of the law is to enlarge private right, not to restrict it. When jury trial was given for the first time in such cases, it was bestowed because the legislature desired to extend its protecting influences, and when afterwards the new constitution was adopted, jury trial in cases where it was then accustomed, received the sanction and protection of the organic law. Writings are to be construed as of the time when they are made; and " heretofore" in this clause, means before 1846, and can not, to limit its meaning, be carried back to 1777, and confined to the cases, which at that earlier period were triable by jury.

This act provides that offences presented personally against the offender and for which he is punishable by fine, by forfeiture and sometimes by imprisonment, shall be tried by any one of the numerous inferior magistrates, either without a jury at all, or by a jury of six men, with very peculiar qualifications. (*L.* 1855, *ch.* 231, § 16.) This is not what the constitution means by jury trial. *Cruger v. Hudson R. R. R.* 2 *Kern.* 190.) That must be within the terms of the constitution a jury of twelve men. The act is entirely inconsistent with the idea that the magistrate is to let the defendant to bail to answer at another criminal court. Its direction is that he is not to take the examination of the defendant, but is to proceed immediately to a trial, and he is to give judgment, and from his judgment an appeal lies. He can, according to the act, proceed only for the purpose of determining upon the guilt or innocence of the accused; and constitutionally this power could not be conferred upon him, the whole provision, which was made only with a view to this kind of trial and not for the purpose of holding the offender to answer elsewhere, must fall.

It follows that the act conferred no jurisdiction upon the magistrate to try the defendant, and that the judgment of the Supreme Court reversing that of the justice, must be affirmed.

HUBBARD, J.—The complainant, John Mathews, a police officer of the city of Brooklyn, arrested the defendant under the 12th section of the act entitled " An act for the prevention of intemperance, pauperism and crime," passed April 9, 1855, for selling in his premises a glass of brandy and a bottle of champagne wine, and seized the said liquors, together with the vessels in which they were contained. The defendant was taken before a police justice of that city by the officer, and there charged by him in substance with keeping for sale and having in his possession, with intent to sell, intoxicating liquors, and with selling one glass of brandy and one bottle of champagne, contrary to the provisions of the said act. The defendant then offered to give the usual bail for his appearance before the next

The People *v.* Toynbee.

court having criminal cognizance. The justice refused to re-
ceive the bail, and the defendant pleaded not guilty. It was
then proved that the defendant kept a hotel in the said city of
Brooklyn, and that on the 17th day of July last he sold one
glass of brandy and one bottle of champagne wine, and a t
the wine was imported liquor. The defendant was found guilty
of the offence charged in the complaint, and was adjudged to
pay a fine of $50 and costs. It was further adjudged that the
liquors so seized by the officer and described in the complaint
be forfeited, and that a warrant issue for their destruction. The
defendant appealed to the Supreme Court in the second judicial
district, where the judgment was reversed. The people then
appealed to this court.

The first ground assumed by the appellant's counsel on the
argument, was that the sale of imported liquors in a l ess quan-
tity than the package of importation, was contrary to the pro-
visions of the act under which the defendant was convicted.
This is clearly a tenable position. In the view which I take
of the law in this case, it is not very essential that it be con-
sidered at much length. But as the point has been fully argued
and presents some questions of general interest as it respects the
relative jurisdictions of the federal and state governments over
imported articles, including liquors, I will consider it in this
place.

It is not contended by the defendant's counsel that the excep-
tion contained in the first section of the act in question, embraces
all imported liquor *in specie* irrespective of its condition,
whether in the hands of the importer or third persons. The
excepting clause reads as follows: " This section shall not
apply to liquor the right to sell which in this state is given
by any law or treaty of the United States." In its general
character, the act is highly penal, and should be construed
strictly. But this rule, intended for the protection of the liberty
or property of the citizen, should not be so applied as to narrow
the ordinary import of the words used, to the exclusion of cases,
a description of property or persons, which, according to com-
mon acceptation, would be within them. (5 *Wheat.* 76.) The

office of all construction or interpretation of statutes, whether penal or remedial in the application of its maxims, is to ascertain the mind or intention of the law makers. ( 1 *Seld.* 562; 2 *id.* 9.) ` Effect should be given, if possible, to every word used, and if doubt exist as to the real intention of the legislature, reference to dispel the ambiguity should be had to the body of the statute, its great object and policy. It is also a cardinal maxim of interpretation to so construe the words of a statute, if possible, as to uphold rather than defeat it; if susceptible of two hostile constructions, to give it that which will sustain and effectuate its object.

In the light of these maxims, it can not be difficult to ascertain the design of the legislature in the exception referred to. The language or phraseology is not the most perspicuous, still the intention is quite apparent. The construction contended for by the defendant's counsel, would make the clause read as though it contained simply the words, " this section shall not apply to imported liquor." Had the legislature intended this broad exception, it is but reasonable to suppose they would have used this simple mode of expression, thus avoiding all speculation as to intention. The mode of expression adopted, evinces clearly that a qualification was intended to be annexed. Considering the whole clause, in connection with the well settled *right* of the importer of liquor, I have no doubt the legislature designed to shield that right of sale in the package of importation, which the importer impliedly has under the laws of congress, and to exempt the liquor *in specie* from the operation of the law, only so far as necessary to protect that right. This construction harmonizes with the policy of the law, which was* to cut off completely the traffic within the state, in all liquor as a beverage, whether imported or not. It would be a futile measure indeed, to proscribe the domestic and give entire *immunity* to imported liquor. Such an act would be *felo de se,* would defeat itself, and vastly increase rather than diminish the evils of intemperance. Such folly should not be imputed to the legislature as intended.

In determining the scope of the exception, therefore, it is

The People *v.* Toynbee.

necessary to ascertain the *nature and extent of the right* of the importer to sell his importation. He has no right, grounded upon any *express* law or treaty; but it has been held that he has an *implied right* growing out of his payment of duties, and that this right can not be directly infringed or taken away by any state law. It was so adjudged in the case of *Brown* v. *The State of Maryland,* (12 *Wheat.* 419,) and approved in the subsequent license cases, in 5 *How.* 504. These decisions, pronounced by the highest tribunal in the land, whose peculiar province it is, to expound the federal constitution and laws, and to define the boundary between the federal and state sovereignties, establish the law that no state can pass a law for the purpose of *license, taxation* or otherwise, directly affecting an import of foreign merchandise while in the hands of the importer, nor impair his right of sale in the original package of importation. A state law having this direct effect, invades the domain of congress in its regulations of foreign commerce.

But it is urged that if the act in question assumes to prohibit the sale of imported liquors by retail, within the interior of the state, it conflicts with the *revenue laws* of congress. The argument is that the prohibition lessens the value of the article, discourages importation, and thus as a consequence diminishes the *quantum* of revenue. This consequence is admitted, but the argument proves too much; legitimately carried out it would forbid the state from enacting any laws for taxation or otherwise, operating upon property imported of all descriptions, as the result must to some extent affect the quantity of imports. But aside from this the question is perfectly answered by the decisions in the Supreme Court of the United States above cited. (*Thurlow* v. *The State of Mass.; Fletcher* v. *The State of Rhode Island; Pierce* v. *The State of New Hampshire*, 5 *How.* 504.) Those cases arose under the license laws of the several states. The two first decide the precise question under consideration. They distinctly hold that the power of congress in regulating foreign commerce extends no further into the interior of a state than is essential to render the force effective in the collection of duties; that for this purpose it embraces the

article imported while it remains in the hands of the importer, and until he exercises his implied right of sale; that as soon as the article loses its *distinctive character as an import*, is broken up or sold, it then mingles with the general mass of property of the state and becomes a subject of state authority. Here is a well defined boundary between federal and state jurisdictions, as it respects all importations.

The act in question by the exception alluded to, expressly refrains from all interference with the operation of the laws of congress. or with the right of sale of the importer as above stated, and hence is not obnoxious to the objection I am considering.

The next question to be considered relates to the prohibitory character of the law, and its vindicatory provisions as it respects existing rights of property in liquor at the time the act took effect. This is purely a question of legislative power, under the fundamental law. It is needless to say that the courts have no concern with the wisdom or expediency of the enactment, to accomplish the beneficent ends indicated by the title. The policy of this government, from its foundation, certainly vindicates the political necessity and economy of stringent laws circumscribing the sale of spirituous liquors.

I entertain no doubt of the constitutional competency of the legislature to prohibit entirely the commerce, within the state, in liquor as a beverage, by laws *prospective in their operation*. If, in the judgment of the legislature, the public welfare required it, the *future production, manufacture or acquisition* of liquor might be prohibited. The sovereign power of the state in all matters pertaining to the public good, the health, good order and morals of the people, is omnipotent. Laws intended to promote the welfare of society, are within legislative discretion, and can not be the just subject of judicial animadversion, except when it is seen that the constitutional guarantees of private property have been invaded. The police power is, of necessity, despotic in its character; individual rights of property, beyond the express constitutional limits, must yield to its exercise And in emergencies, it may be exercised to the

The People *v.* Toynbee.

destruction of property without compensation to the owner, and even without the formality of a legal investigation. It is upon this principle that health and quarantine laws are established, that a building is blown up to arrest a conflagration in a populous town, that the public market is purged of infectious articles; that merchandise on ship board, infested with pestilence, is cast into the deep, and public nuisances are abated. It is the public exigency which demands the summary destruction, upon the maxim that the safety of society is the paramount law. It is the application of the personal right or principle of *self preservation* to the body politic.

I know of no limits to the exercise of the police power vested in the legislature, except the restrictions contained in the written constitution. Under our system of government, with co-ordinate branches, each independent within its sphere, and all deriving their powers from a common source, the fundamental law, one can not exercise a supremacy over the other, except as it finds its warrant for it in that law. The judiciary possesses no legitimate authority over the acts of the legislature, aside from the constitutional grant; and even this authority is exercised in an indirect manner, when its powers are appealed to, to carry a statutory law into effect; and then only as it respects the individual rights of property or of person.

It is said that this idea of the omnipotency of the legislature, within the express constitutional restrictions, is a fallacy. It is conceded that all power emanates from the people, and that the written constitution clothes the legislature with all the power it possesses. But the grant of power in that instrument is general, of all the legislative power of the state; what this is precisely, is not and can not well be defined. Aside from the express limitations, it is believed to embrace all the common law power which the legislature would have possessed had the fundamental law remained, as in England, a part of the unwritten law of the state. This is by no means an alarming proposition. The declaration of rights forming the

guaranty of personal liberty and property, in the first article of the constitution, when construed according to its full spirit and intent, is quite ample to protect the citizen against the unauthorized encroachments of the legislature; to protect against all sumptuary laws and laws of kindred character, which have not the public good for their object. I am opposed to the judiciary attempting to set bounds to legislative authority, or declaring a statute invalid upon any fanciful theory of higher law, or . first principles of natural right, outside the constitution. If the courts may imply any limitation, there is no bound to implication, except judicial discretion, which must place the courts above the legislature, and also the constitution itself. This is hostile to the theory of the government. The constitution is the only standard for the courts to determine the question of statutory validity.

There is no constitutional restriction upon the power of the legislature in the regulation of the sale or traffic in intoxicating drinks, whether affecting existing rights of property in liquor or not. As a scheme of *regulation,* the degree of the limitation of the sale or traffic is a matter of legislative discretion.

The fault of the present law is, that it does not profess to be a scheme of regulation. There is no attempted discrimination between liquor owned at the time the law took effect, and that acquired afterwards. I have reflected with much attention to see whether the courts could not make the discrimination, for instance, as a question of fact to be ascertained in a given case, but I have encountered the insurmountable difficulty, that the legislature plainly intended that there should be no such distinction. No defence or trial could be admitted on such ground, for the reason that it would be against the manifest policy of the act. It is the intent of the statute alone which the courts are authorized to execute.

The prohibitory feature of the law must therefore be regarded as extending to all liquor in the state, at the time the act took effect. In this aspect, I will in few words give my views of its unconstitutionality as it respects vested rights of property

in liquor under the organic law, which forbid the citizen being deprived of his property without *due process of law.*

That liquor is recognized by the law as property, that the constitution knows no distinction in its guaranties of the rights of property of all kinds, that the constitutionality of the laws is to be tested the same as though it related to some other and perhaps better species of property, is not questioned. The constitution surrounds liquor as property, with the same inviolability as any other species of property. There can be no room, I think, for difference of opinion as to the meaning of the phrase " due process of law," as used in the constitution. It means an ordinary judicial proceeding. In a criminal case, an arraignment, formal complaint, confronting of witnesses, a trial, and regular conviction and judgment. When a forfeiture of property is made a part of the punishment as in this case, the judgment embracing it would in its effect deprive the offender of his property in the constitutional sense. I think it competent for the legislature to declare a forfeiture of liquor which an offender may have in possession, as a mode of punishment; and if the law in question was in other respects constitutional, I should uphold the judgment of forfeiture in this case as entirely proper. But the portion of the law which authorizes the seizure and destruction of liquor where the prosecution or conviction of the owner is not contemplated, I should not hesitate to pronounce void, as property is thus destroyed or the citizen deprived of it without process of law. It is not pretended, nor can it be, that property which is not *per se* a nuisance can be annihilated by the force of a statute alone, or by proceeding *in rem* for the punishment of a personal offence. Liquor is not a nuisance *per se,* nor can it be made so by a simple legislative declaration. It does not stand in the category of common nuisances, which of themselves endanger the welfare or safety of society. It is its use and abuse as a beverage which gives it its offensive character. Otherwise it is entirely inoffensive. In my judgment, therefore, it can not be confiscated to prevent its misuse, except through a prosecution against the owner *in personam.*

But it is said that this law does not assume to deprive any one of his property in liquor; that the owner is allowed to retain the unmolested custody and personal use of it, according to his pleasure. It is true, that the owner may not be molested in this enjoyment, provided he keeps it in his dwelling house, if fortunate enough to possess a domicil. I apprehend that by a fair construction of the law, he is forbidden, under a severe penalty, from keeping it elsewhere, except for mechanical and other specified uses, although innocent of any intent to sell. I have examined the first section of the law with care to see if it could not be construed in such manner as to make the keeping in any place, except a dwelling house, criminal only, when accompanied with an intent to sell. But the section can not be so construed. The language is too clear to admit of a doubt as to the intention of the legislature. The keeping or deposit in any place, except in a dwelling house, or place where some trade or business is carried on, requiring its use, is prohibited, and by the fourth section of the act such keeping or deposit is a crime. This certainly is a most extraordinary provision, which must have the effect to render a person a criminal who was so unfortunate as to have a quantity of liquor on hand in a forbidden place at the time the law took effect, although he had no intent to violate the law by selling. A person thus circumstanced would have but one of two methods to avoid criminality, either just before the law took effect to remove the liquor to a dwelling house or to a shop for mechanical and other prescribed uses, or destroy it with his own hand. I can scarcely credit the thought, that the legislature designed the law to have this effect; but no other construction can be put upon the language of the first section of the law, and we are bound to suppose judicially that the legislature intended what their words import.

The law does not even countenance the exportation of the liquor after it took effect. The plain design of the law seems to have been to cut off the *liquor itself*, to ensure its destruction, by circumscribing the keeping of it, and authorizing its seizure if kept in a forbidden place, or with a criminal intent

to sell. The entire right of sale within the state at least, is prohibited, and in this, in my judgment, consists the error of the law, as it respects the liquor owned when the law went into operation. If there had been any right of sale within the state preserved, for instance to a licensed vender, although of minor importance, it would have been sufficient, perhaps, to have impressed the law with a character of regulation, and saved its validity.

But the abolition of all right of sale in the state, is equivalent to, and is, a substantial deprivation of the owner of his property. The right of sale is of the very essence of property in any article of merchandise, its chief characteristic: take away its vendible quality and the article is practically destroyed. As applied to merchandise of any description, this effect can be judicially seen. Even if the law allowed exportation, that would be of such minor importance, as not to save the law from the charge of effectually depriving the owner of his property in the liquor. It is but of trifling value after the entire domestic market is closed against it.

I am unable, therefore, to avoid the conclusion, that the prohibition in the first section of the law is invalid, inasmuch as it makes no discrimination, nor allows the courts to make any, but extends to all liquor irrespective of the term of its acquisition, and that by closing the domestic or state market, it in effect substantially deprives the owner of liquor acquired before the law took effect, of his vested rights of property therein, without due process of law.

At the trial before the police justice the defendant offered bail for his appearance before a higher court having criminal jurisdiction. It was an error for the court to refuse to receive it. I am well satisfied that the defendant had a constitutional right of trial by a common law jury of twelve men, and that to this end, he should have been allowed to give bail to appear before a tribunal where such a jury could be obtained. This right of trial by jury is secured by article 1, section 2 of the constitution, which reads, " The trial by jury in all *cases* in which it has been heretofore used shall remain inviolate forever."

The term *cases* is used in a *generic* sense, it embraces grades or classes, not individual or particular cases, except as they make up a class. The intent of the constitution was to preserve the right as amply as it was enjoyed at the time of its adoption. The right of bail existed in all cases of felonies and misdemeanors, and was intended to be preserved, without any distinction as to whether the offence existed at the time the constitution took effect, or was subsequently enacted by statute. There is no ground for any such distinction in principle, as the right is as important in the one case as the other, as the punishment may be the same.

Section six of the same article of the constitution does not assume to limit the operation of section 2. That section simply forbids the legislature from enacting any law by which an offender charged with an infamous crime, in other words a felony, may be held to answer except upon indictment. By implication, it is said, the legislature may prescribe the mode of trial in all cases of misdemeanor. No such implication should be indulged to take away an express grant of the great privilege of trial by a common law jury by another section. It may be that under this implication the legislature may provide for the trial of a misdemeanor before a court of Special Sessions, with or without a jury, subject, nevertheless, to the right of the accused to give bail to secure the advantages of a jury at common law. In this view the two sections are harmonious, and do not in any respect conflict.

It may be said perhaps that the right of such a jury trial in misdemeanors is not an absolute right under the law as existing when the constitution was adopted, that it was conditioned upon giving bail within twenty-four hours after arraignment. This condition, however, does not affect the right itself; it is the misfortune of the accused if his poverty prevents him from availing himself of the condition. The right is perfect, and the constitution secures its exercise upon the condition, which can not be taken away by any legislative act.

I am of the opinion therefore that the judgment of the Supreme Court ought to be affirmed.

The People *v.* Toynbee.

The conclusion arrived at by Judges SELDEN, A. S. JOHNSON and HUBBARD, was concurred in by Denio, Ch. J. and by Judges Comstock and Mitchell, the latter voting for affirmance on the ground that the defendant had been deprived by the act of his constitutional right of trial by jury.

The following dissenting opinion was delivered by

T. A. JOHNSON, J.—It has been shown, I think, in the case of *Wynehamer* v. *The People*, decided at this term, and we all agree, that imported liquors, the moment they leave the hands of the importer, have passed the line of foreign commerce and federal authority, and become exclusively subject to state regulations and control. And that when they are once brought into this condition, the only right which attaches, so far as any right flows from government, is derived wholly from state laws and they are not then within the exception of the first section of the act.

I have also attempted in that case, as I think, successfully, to demonstrate that the legislature, being the sole and exclusive law-making power in the state, has, by virtue of its office, from the very nature and constitution of government, the power, and is charged with the duty, of regulating, restricting, controlling, and even prohibiting altogether, any traffic in any property which is found to be demoralizing in its effects upon the community, or injurious to its interests, or burthensome to the government. And that there is not, either in the constitution of the United States or in that of this state, any limitation or restriction upon the exercise of this power, which is, in any respect, in conflict with the provisions of this act, so far as it prohibits the sale of intoxicating liquors.

The right of traffic or the transmission of property, as an absolute, inalienable right, is one which never has existed since governments were instituted, and never can exist under government. The government has always regulated and controlled it to the full extent required, in its judgment, by the public interests and necessities, as the whole history of legislation will clearly show. Government possesses many powers which

it does not habitually or frequently exercise, and only puts forth to remedy particular evils or to meet occasional exigencies. But it must necessarily have the same right to prohibit any particular traffic, or branch of traffic, which it finds or deems injurious, and to declare it criminal, that it has to prohibit and declare criminal the injurious conduct and practices of men in other respects. Otherwise, the right to property and its transmission would be held superior to the right to life and liberty.

Our statutes " concerning the acquisition, the enjoyment and transmission of property, real and personal " ·(1 *R. S*. 717) " of the regulation of trade in certain cases " (*id*. 528); " of the proof and recording of conveyances of real estate " (*id*. 755); all acts relating to revenue, excise, usury, champerty, lotteries, and the like, with which our statute-books abound, have their sole foundation in this right.

This being so, it follows, inevitably, that the occasion and necessity for the exercise of the power embodied in a statute is wholly a matter of legislative judgment and discretion, where no constitutional restriction intervenes, with which no other power in the government has any right to interfere; at least, after the executive sanction has been given.

If the legislature shall determine that the occasion has arisen, or that the necessity exists, for the exercise of a more extended and stringent power, than it has hitherto exercised, who shall decide to the contrary. What ·other tribunal is clothed with power to entertain an appeal, and ·reverse such determination?

The veto power, given to the executive, is the only authority the constitution has provided, and that must be exercised before legislation has ripened into statutes, and is then, not necessarily conclusive.

Whoever bestows the slightest reflection upon the nature and character of the judicial office, will see that courts can entertain no such question. And any attempt on their part to take cognizance of it, and to draw it within their jurisdiction, would be a clear invasion of the legislative province, and a usurpation of legislative power.

The People v. Toynbee.

The spectacle of a conflict, between the representatives of the legislative and the judicial sovereignty, of the people, respecting a question of this character, upon any other than clear, undoubted, constitutional grounds, would, at this day, be at once novel and alarming.

How the judiciary must fare, in such a contest, in such a cause, it is not difficult to foresee. Every legislative act, when questioned, is to be brought to the test of the constitution, and if the power exercised is not there forbidden, in express terms, or by clear and necessary implication, courts have no discretion but are bound to pronounce it valid. The right of courts to declare legislative enactments, in derogation of the constitution, void, is one which has been too long and steadily exercised in this country, to be now doubted or questioned.

It is, however, one of the highest and most delicate of all conservative powers, and is never to be exercised against the acts of the superior branch of the sovereignty, in doubtful and questionable cases. The legislative department, being naturally the superior, its authority is always presumed to have been rightfully exercised. And this presumption is to prevail, until the contrary has been made clearly to appear, and has been determined by the courts.

The only questions which arise in this case, differing from those considered in the case before referred to, relate to the authority and jurisdiction of the court of Special Session before whom the defendant was tried and convicted, and the right of seizure and destruction of the contraband property.

These I propose very briefly to consider. It appears from the case, that when the defendant was arrested and brought before the justice, he objected to being tried by a court of Special Sessions, and offered to give bail to appear at the next court having criminal jurisdiction. The objection was overruled, the right to give bail denied, and the defendant was compelled to go to trial before the Special Sessions. It is claimed that the court erred in refusing to take bail. The court was I think right in refusing to take bail.

The act undoubtedly contemplates, and was designed to effect, a speedy trial, and hence the justices and other officers authorized to issue a process under the act, are required imperatively, to hold courts of Special Sessions, to hear and determine charges, and to proceed to trial as soon as the complainant can be notified, unless for good cause shown an adjournment shall be granted.

Hence also the privilege given to persons brought before a magistrate in the cases prescribed in the Revised Statutes of giving bail to appear at another court, and thus avoiding a trial before the Special Sessions, is not given to the persons complained of, for the offences created by this act. Under the Revised Statutes the right of the court of Special Sessions to try a person for any of the offences therein specified is given, subject to the request of such person to be so tried, or to his failure or refusal to give bail, for twenty-four hours after being required by the magistrate.

But the right of such court, under this act, is subject to no such conditions. On this point, as well as the others in the case, I agree fully with Welles, Justice, in *The People* v. *Fisher*, (20*th Barb.* 652).

It is contended that if this is the true construction of the act, it is, in this respect, in violation of the constitutional provision that, " the trial by jury in all cases in which it has been heretofore used, shall remain inviolate forever." It is conceded that the jury here referred to is a common law jury of twelve men. This act only allows a jury of six before a court of Special Sessions, and this clearly is not the jury intended by the constitution.

The terms " as heretofore used " in the constitution, mean as used, before the adoption of the existing constitution. (*Cruger agt. The Hudson River Railroad Co.*, (2 *Kern.* 198, per *Johnson J.*) *Duffy* v. *The People* (6 *Hill*, 78.)

Trials for offences of this grade have been uniformly authorized, and had long before the adoption of the present constitution, and, indeed under all our previous constitutions, without the use of a jury, or with a jury of only six. It was ex-

pressly held by the court for the correction of errors, in the case last cited, that a statute which authorized a magistrate to convict a person of being a disorderly person, which included the power of sentence and commitment to jail. was constitutional, although it did not give the right of trial by jury. And in that case the power of the legislature to confer upon courts of Special Sessions the right to try offences below the grade of felony without indictment, and without a jury, is fully recognized and sanctioned. It is argued that the right to have a trial by a common law jury was secured to every one charged with a misdemeanor under the provisions of the Revised Statutes, allowing them to give bail for appearance at a higher court. And hence the inference is sought to be drawn, that the right has never been taken away in any case, but has always been used, and consequently, that the legislature had no right to take it away in these cases.

It will be seen, however, that although by the Revised Statutes, the jurisdiction of the Special Sessions to try and punish is made subject to certain conditions, the right of trial by jury is by no means there secured in all cases.

If a person is unable to furnish bail, to appear at another court, it is the right and duty of that court to try him notwithstanding his desire or demand, to be tried elsewhere. This is as much a violation of his right, if it is one secured by the constitution, as though the statute had in terms forbidden the magistrate to take bail.

But it is a question of the power of the legislature to confer the jurisdiction upon these courts, and that question can never be made to depend upon the consent or request of the person accused, to be tried, or upon his ability to furnish bail to appear at another court. It is a privilege given by the legislature in such cases, which might have been withheld. The power of the legislature to determine before what courts, with or without a jury, offences of this character shall be tried, is I think undoubted. This view answers the other objection, that a trial and conviction, before such a court, is not by due process of law.

The case shows that the offence was committed in the presence of a policeman, who thereupon seized the bottle of champagne so sold, and the bottle of brandy, and its contents, from which the quantity sold to be drank had been taken. The right, therefore, to search for liquors, supposed or suspected to be kept for unlawful purposes, does not arise in the case. The court before whom the defendant was tried, adjudged that the liquor was unlawfully kept and that it was forfeited, and issued his warrant for its destruction.

It is contended that no person can be deprived of his property in this manner. If the trial and conviction are by due course of law, it is difficult to see upon what foundation this objection can rest. The power of the legislature to authorize and impose, by way of penalty, the forfeiture, upon judicial sentence, of property kept, or sought to be used, contrary to law, can not at this day be seriously questioned. It is the lowest grade and form of punishment for offences against the law, and has been too long and steadily exercised, without question, to be now involved in any doubt. Instances of the exercise of this power must be too familiar to every lawyer to need citation.

The act of seizure by the officer was clearly lawful. The unlawful act was open and flagrant in the officer's presence, and it would have been a gross and inexcusable breach of duty, on his part, had he overlooked it.

The twelfth section authorizes the seizure by an officer under such circumstances, without warrant, to be taken before a magistrate, as was done in this case.

The conviction and sentence was therefore, in my judgment, in all respects lawful and proper, and the judgment of the Supreme Court should be reversed.

In determining this case, the Court of Appeals established the following propositions:

1. That the prohibitory act, in its operation upon property in intoxicating liquors existing in the hands of any citizen of this state when the act took effect, is a violation of the provi-

The People *v.* Toynbee.

sion in the constitution of this state, which declares that no person shall be " deprived of life, liberty or property, without due process of law." The court is of opinion that the various provisions, prohibitions and penalties contained in the act, substantially destroy the property in such liquors, in violation of the terms and spirit of the constitutional provision.

2. That inasmuch as the act does not discriminate between such liquors existing when it took effect as a law, and such as might thereafter be acquired by importation or manufacture, and does not countenance or warrant any defence based upon the distinction referred to, it can not be sustained in respect to any such liquor, whether existing at the time the act took effect, or acquired subsequently; although all the judges were of opinion that it would be competent for the legislature to pass such an act as the one under consideration (except as to some of the forms of proceeding to enforce it) provided such act should be plainly and distinctly prospective as to the property on which it should operate.

3. That the proceeding in a court of Special Sessions authorized by the said act is unconstitutional and void, on the ground that the party accused is thereby deprived of the right of trial by jury guaranteed by the constitution.

Judges MITCHELL, WRIGHT and T. A. JOHNSON did not concur in the conclusions arrived at by the majority of the court, upon the first and second of the above mentioned propositions; and Judges WRIGHT and T. A. JOHNSON did not concur in the last proposition.

Judgment of the Supreme Court affirmed.